307 F.3d 243
 Thomas SYPNIEWSKI, Jr.; Matthew Sypniewski; Brian Sypniewski
v.
WARREN HILLS REGIONAL BOARD OF EDUCATION; Peter Merluzzi, in his personal and official capacity as Superintendent of the Warren Hills Regional Board of Education; Beth Godett, in her personal and official capacity as Principal of the Warren Hills Regional High School; Ronald Griffith; Phillip Chalupa, in their personal and official capacity as Vice Principals of Warren Hills Regional High School; Elizabeth Ames; Marcy Matlosz; Ray Busch; Suyling Heurich; James T. Momary; Nancy Fallen; William Miller; Bradley Breslin; Scott Schantzenbach, in their official capacity as members of the Warren Hills Regional Board of Education
Matthew Sypniewski; Brian Sypniewski, Appellants.
 No. 01-3542.
 United States Court of Appeals, Third Circuit.
 Argued March 4, 2002.
 Filed October 3, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Gerald Walpin, Esquire (Argued), Katten, Muchin, Zavis & Rosenman, New York, NY, for Appellants.
 James W. Broscious, Esquire (Argued), Broscious, Glynn & Fischer, Washington, NJ, for Appellees.
 Before: SCIRICA and ROSENN, Circuit Judges, and WARD, District Judge.*
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 At issue is the constitutionality, both facially and as applied, of a public school's racial harassment policy against a background of demonstrated racial hostility. The specific issue is whether the public school's policy violates the First Amendment protection of students' rights to free expression.
 
 I.
 
 2
 The Warren Hills School District's racial harassment policy was enacted in response to a pattern of disturbing racial incidents. Shortly thereafter, Thomas Sypniewski was suspended from school for wearing a "Jeff Foxworthy" T-shirt inscribed with "redneck" jokes. Thomas Sypniewski filed this lawsuit (together with his brothers Matthew and Brian) mounting a facial and as applied challenge to the constitutionality of the harassment policy and dress code.[1]
 
 
 3
 The Sypniewski brothers named as defendants: the Warren Hills Regional Board of Education; Peter Merluzzi, the superintendent of the board of education; Beth Godett, the principal of the high school; Ronald Griffith and Philip Chalupa, vice principals of the high school; and Elizabeth Ames, Bradley Breslin, Ray Busch, Nancy Fallen, Suyling Heurich, Marcy Matlosz, William Miller, James T. Momary, and Scott Schantzenbach, all members of the board of education.
 
 
 4
 Plaintiffs moved for a preliminary injunction against further enforcement of the racial harassment policy. The District Court denied the request for injunctive relief. Plaintiffs have appealed.
 
 
 5
 
 a. Racial Hostility in the Warren Hills Schools.
 
 
 
 6
 The first racial incident cited by the District Court occurred in October 1999 at the high school.[2] A white student dressed for Halloween "costume day" by wearing overall jeans and a straw hat and appearing in black face. He also wore a thick rope around his neck tied in a noose. The student was sent home and suspended. Also during that year, a high school student submitted a racial harassment complaint based on several students' wearing shirts bearing the Confederate flag.
 
 
 7
 The number of incidents grew during the 2000-2001 school year. Several students continued the practice of wearing clothing displaying the Confederate flag. Some formed a "gang-like" group known as "the Hicks," and observed "White Power Wednesdays" by wearing Confederate flag clothing. On Wednesday, September 20, 2000, a student walked down a main hallway in the high school waving a large Confederate flag. The flag was confiscated, but the student was not disciplined.
 
 
 8
 Several students complained about the flag waving incident to Ronald Griffith, a vice principal of the Warren Hills Regional High School. They also reported that some students were telling racially offensive jokes and disseminating racially offensive material downloaded from the Internet. Griffith spoke to two students involved in the events of September 20, who confirmed the existence of the Hicks and White Power Wednesdays. One of these students was suspended for possessing racially offensive materials.
 
 
 9
 Thomas Sypniewski acknowledges that he wore shirts displaying Confederate flags to school. In an October 4, 2000 local newspaper article about the Confederate flag at the high school, Thomas Sypniewski is pictured wearing a T-shirt displaying the text, "Not only am I perfect, I'm a Redneck too!" The word "redneck" is printed in such a way that a Confederate flag shows through the letters. Whether he was a member of the Hicks, however, is unclear. He denies it. The District Court expressly declined to make a finding on this issue. In any event, the record suggests he was at least friendly with members of the Hicks, a group that does not appear to have been formally organized. There is no evidence that the other two Sypniewskis were affiliated with the Hicks.
 
 
 10
 Vice Principal Griffith's investigation of these incidents revealed that the level of racial tension in the high school was significant. Many students were deeply offended by the actions of the Hicks and their friends. At least one student reported he "felt like" responding violently. The District Court also found the racial tension spilled over into the classroom, displacing class lessons with discussions about racial relations. But neither Thomas Sypniewski nor the word "redneck" was specifically mentioned by the students Griffith interviewed.
 
 
 11
 On December 1, 2000, a white student recently enrolled at the high school was harassed at home. Apparently in response to this student's association with several African-American students, a large group of teenagers drove to his house where they physically threatened the student and called him a "nigger lover," among other expletives.
 
 
 12
 White Power Wednesdays continued. Some high school students wore clothing bearing the Confederate flag throughout the fall and winter. A student came to school with a large Confederate flag draped over the back of his truck. Numerous instances of racist graffiti were found on school walls, some of which inspired hostile graffiti responses. On one occasion, some students played a dehumanizing, racist song from their trucks in the parking lot. Near the end of the school year, a fight occurred between a black student and a white student that resulted in one student sustaining a concussion and requiring stitches. And according to Superintendent Merluzzi, several students continued to engage in other "racially harassing behavior."
 
 
 13
 In short, the record clearly supports the District Court's finding that the Warren Hills public schools — particularly the high school — were afflicted with pervasive racial disturbances throughout the 2000-2001 school year.
 
 
 14
 
 b. The School Board's Response.
 
 
 
 15
 The racial difficulties at the high school began to attract the attention of the community early on. The school board responded by placing the issue of Confederate flag clothing on the agenda of its regularly scheduled meeting on October 3, 2000. Several parents spoke on both sides of the issue, including both Sypniewski parents, who spoke against a proposed Confederate flag ban.
 
 
 16
 Superintendent Merluzzi also spoke at the meeting. Expressing concern for the students' free speech rights, he stated his view that the problem was limited to a sufficiently small number of students that it could be dealt with without adopting policy changes such as banning the Confederate flag. In particular, Merluzzi noted the existence of a peer mediation program, which he thought adequate to deal with many of the racial problems. The board of education shared Merluzzi's reluctance to implement a formal policy at that time, and instead resolved to investigate its options.
 
 
 17
 On October 20, 2000, Timothy Downs, the school district's Peer Mediation Coordinator, issued an internal report containing several findings concerning the racial strife at the high school during the preceding month.[3] Based in part on these findings, Downs reached a conclusion different from that expressed by Superintendent Merluzzi at the October 3, 2000 board meeting. The report stated, "At this time this issue is too complex, involves too many people, and is too controversial for Peer Mediation Services." The report recommended that "[t]he wearing of the Confederate flag for non instructional purposes should be disallowed in the Warren Hills Regional School District."
 
 
 18
 By February 2001, after several months of continued racial problems, including regular wearing of clothing decorated with the Confederate flag and the off campus incident of December 1, the school district changed its view on the necessity of implementing a formal policy. According to Superintendent Merluzzi, "It was the consensus of the Board of Education and myself that there had been significant disruption in the school and that the minority population was at significant risk from, not only verbal and intimidating harassment but also, increasingly, the risk of physical violence."
 
 
 19
 The school board researched racial harassment policies that had been adopted by other school districts and selected a policy that had passed constitutional muster before the Court of Appeals for the Tenth Circuit. West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358 (10th Cir.2000). The adopted policy reads, in part:
 
 
 20
 District employees and student(s) shall not racially harass or intimidate other student(s) or employee(s) by name calling, using racial or derogatory slurs, wearing or possession of items depicting or implying racial hatred or prejudice. District employees and students shall not at school, on school property or at school activities wear or have in their possession any written material, either printed or in their own handwriting, that is racially divisive or creates ill will or hatred. (Examples: clothing, articles, material, publications or any item that denotes Ku Klux Klan, Arayan [sic] Nation-White Supremacy, Black Power, Confederate flags or articles, Neo-Nazi or any other "hate" group. This list is not intended to be all inclusive.)
 
 
 21
 As part of the instructional process, professional staff may display and discuss divisive materials and/or symbols when selected and used to enhance knowledge, provided these topics are included in the approved Warren Hills Regional Schools curriculum. Said materials must be removed from display daily.[4]
 
 
 22
 The board presented the proposed policy at its meeting on February 20, 2001, and adopted it on March 6, for implementation on March 13, 2001. As noted, racially controversial incidents occurred until the end of the school year, including at least one student wearing clothing displaying the Confederate flag despite the ban.
 
 
 23
 
 c. The Jeff Foxworthy T-Shirt.
 
 
 
 24
 Each of the three Sypniewski boys owned a T-Shirt featuring the humor of Jeff Foxworthy. Brian Sypniewski had purchased the three shirts at Wal-Mart in September 1999. The T-Shirts contained the following text:
 
 
 25
 Top 10 reasons you might be a Redneck Sports Fan if ...
 
 
 26
 10. You've ever been shirtless at a freezing football game.
 
 
 27
 9. Your carpet used to be part of a football field.
 
 
 28
 8. Your basketball hoop used to be a fishing net.
 
 
 29
 7. There's a roll of duct tape in your golf bag.
 
 
 30
 6. You know the Hooter's [sic] menu by heart.
 
 
 31
 5. Your mama is banned from the front row at wrestling matches.
 
 
 32
 4. Your bowling team has it's [sic] own fight song.
 
 
 33
 3. You think the "Bud Bowl" is real.
 
 
 34
 2. You wear a baseball cap to bed.
 
 
 35
 1. You've ever told your bookie "I was just kidding."
 
 
 36
 The T-shirt is fairly representative of Foxworthy's "country humor." Foxworthy has produced several books and compact discs with names such as, "You Might Be a Redneck if," "Blue Collar Comedy Tour," "Games Rednecks Play," and "Hick is Chic." His Internet website features a "Redneck Joke of the Day." http://www.jefffoxworthy.com. The term "redneck" appears throughout Foxworthy's work.
 
 
 37
 Plaintiffs stress the mainstream appeal of Foxworthy's humor, noting he starred in his own situation comedy, the "Jeff Foxworthy Show," on network television for two seasons. Foxworthy also appeared on a television special that featured President George W. Bush. He currently has a syndicated radio show, "The Foxworthy Countdown," where he plays country music and tells jokes. He has been featured on a line of greeting cards. And as noted, the T-shirts worn by the Sypniewskis were purchased at Wal-Mart.
 
 
 38
 Each of the Sypniewski boys had worn the shirt to their respective schools[5] several times during the 2000-2001 school year. Thomas had also worn his shirt several times the previous year. There is no evidence that any student or administrator objected to the T-shirt at any time, or that it caused any disruption before the adoption of the racial harassment policy.
 
 
 39
 On March 22, 2001, Thomas Sypniewski wore the T-shirt to school for the first time after the implementation of the harassment policy. He wore the shirt without incident until last period of the day, when he was directed to Vice Principal Griffith's office by Neil Corley, a security guard at the high school. What occurred at that time between Thomas Sypniewski and Corley is disputed. In his report, Corley stated, "Tommy said something to the effect `I've been waiting all day for someone to notice.'" Thomas Sypniewski is quoted in the local newspaper as saying, "The thought crossed my mind that this is going to piss people off." Defendants contend these statements demonstrate that Thomas Sypniewski intended wearing the shirt to be a provocative act. Thomas Sypniewski denies making both statements. Instead, he claims to have said to Corley, "This is the last period of the day. I've been walking around all day and now you've noticed" and intended to send no message related to race. The District Court did not resolve this factual dispute.
 
 
 40
 Vice Principal Griffith told Thomas Sypniewski the shirt violated the school dress code[6] — a policy that had been in place prior to disturbances that gave rise to the decision to adopt the racial harassment policy. Vice Principal Griffith stated he viewed the shirt as violating the code for several reasons. The references to the Bud Bowl[7] and Hooters restaurant,[8] he said, violated prohibitions on mentioning alcohol and sexual innuendo. His primary concern, however, was the appearance of the word "redneck" on the shirt "because of the troubling history of racial tension at our school and the possibility that the term `redneck' would incite some form of violence and at a minimum be offensive and harassing to our minority population." Griffith gave Thomas Sypniewski the option of turning the shirt inside out. When Thomas refused, Griffith suspended him for three days. Apparently wishing to refrain from imposing the stiffer penalties associated with the racial harassment policy, Vice Principal Griffith did not mention the harassment policy as a basis for his action, even though he viewed the shirt as prohibited by that policy as well.
 
 
 41
 The following day, Brian Sypniewski wore his Foxworthy shirt to the middle school. The vice principal of the middle school, Robert Griffin, told Brian he had spoken with Superintendent Merluzzi, and that they had determined the shirt was neither offensive nor in violation of the dress code.
 
 
 42
 On March 26, 2001, Thomas Sypniewski appealed his suspension to the board of education. The board denied the appeal and upheld the suspension. As had Vice Principal Griffith, the board based its decision on the dress code and insubordination — not on the racial harassment policy. Apparently referring to Brian Sypniewski's wearing the shirt without penalty, the board stated "in hindsight action should have been taken with respect to this incident as well."
 
 
 43
 As noted, some racially provocative behavior continued through the end of the school year, despite implementation of the racial harassment policy. Shortly after Thomas Sypniewski graduated from the high school, he and his brothers filed this lawsuit.
 
 
 44
 
 d. This Action.
 
 
 
 45
 In their complaint, plaintiffs sought to preliminarily enjoin enforcement of both the racial harassment policy and the dress code as unconstitutional restrictions on students' freedom of speech under the First and Fourteenth Amendments to the Constitution, and under the New Jersey Constitution, Article I, Section 6. They also sought damages for actions taken against Thomas Sypniewski, alleging unlawful suspension under both the United States and New Jersey Constitutions, as well as claims for defamation and "false light" under New Jersey law. The District Court denied plaintiffs' motion for a preliminary injunction with respect to the racial harassment policy, but found "the challenged portion of the Dress Code may not satisfy constitutional standards and should therefore not be enforced prospectively during the pendency of this litigation against the wearing of clothing which violates the Racial Harassment Policy." Sypniewski, No. 01-3061, at 75. Plaintiffs have appealed the court's order that the racial harassment policy is consistent with plaintiffs' — and other students' — constitutional rights.[9]
 
 
 46
 Because this is an appeal from a denial of a motion for preliminary injunction, our review is limited to the prospective relief the District Court refused to grant.[10] Thus, our sole concern is whether the Warren Hills School District can continue constitutionally to enforce the racial harassment policy. Because Thomas Sypniewski has graduated and has left the reach of the school district's policies, he is not a party to this appeal.
 
 II.
 
 47
 We employ a tripartite standard of review for refusals to issue preliminary injunctions. We review the District Court's findings of fact for clear error. Legal conclusions are assessed de novo. The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion. Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 170 (3d Cir.2001).
 
 
 48
 In determining the appropriateness of issuing a preliminary injunction, four factors must be considered: "(1) whether the movant has a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest." Id. at 171. The litigants have briefed in depth only the first requirement: whether the Sypniewskis have a reasonable probability of success on the merits. Because this is the essential element at issue here, we will focus our discussion on plaintiffs' likelihood of success on the merits of their constitutional claims.
 
 III.
 
 49
 Plaintiffs contest the constitutionality of the racial harassment policy both facially and as applied. Contending the policy is both unconstitutionally vague and overbroad on its face, plaintiffs maintain it should be struck down in its entirety. Because we are only concerned here with prospective violations, plaintiffs' challenge to the application of the policy to Thomas Sypniewski's wearing the shirt on March 22, 2001 is not before us. But plaintiffs seek an injunction against further enforcement of the racial harassment policy to ban the Foxworthy shirt, which both Matthew and Brian — who remain in the school system — still own.
 
 
 50
 
 a. Freedom of Speech in Public Schools.
 
 
 
 51
 The public school setting demands a special approach to First Amendment disputes. Most students are minors, and school administrators must have authority to provide and facilitate education and to maintain order. The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). On the other hand, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Id. at 506, 89 S.Ct. 733. Thus, students retain the protections of the First Amendment, but the shape of these rights in the public school setting may not always mirror the contours of constitutional protections afforded in other contexts.
 
 
 52
 In Tinker, school officials prevented a group of students from wearing black armbands to express their opposition to our country's participation in the war in Vietnam. The Court upheld the students' right to do so because there was "no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be left alone." Id. at 508, 89 S.Ct. 733. Responding to the school authorities' attempt to justify their action by reason of a concern about the possibility of the armbands' creating a disturbance in school, the Court held that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Id. By contrast, "conduct by the student, in class or out of it, which for any reason — whether it stems from time, place, or type of behavior — materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Id. at 513, 89 S.Ct. 733. "As subsequent federal cases have made clear, Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 211 (3d Cir.2001). In sum, "if a school can point to a well-founded expectation of disruption — especially one based on past incidents arising out of similar speech — the restriction may pass constitutional muster." Id. at 212.
 
 
 53
 Following Tinker, the Supreme Court decided two other major cases implicating freedom of expression in public schools. In Bethel School District No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), a school disciplined a student for a student government nominating speech filled with sexual metaphor viewed by the school and the Court as lewd. The Court upheld the school's authority to do so because of "society's ... interest in teaching students the boundaries of socially appropriate behavior." Id. at 681, 106 S.Ct. 3159. Schools are not prevented by the First Amendment from encouraging the "fundamental values of `habits and manners of civility,'" id. at 681, 106 S.Ct. 3159, by "insisting that certain modes of expression are inappropriate and subject to sanctions." Id. at 683, 106 S.Ct. 3159. And "[t]he determination of what manner of speech ... is inappropriate properly rests with the school board." Id. We have interpreted Fraser as establishing that "there is no First Amendment protection for `lewd,' `vulgar,' `indecent,' and `plainly offensive' speech in school.'" Saxe, 240 F.3d at 213.
 
 
 54
 Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), involved the authority of school officials to control the content of a student newspaper. The Court upheld the school's deletion of an article from the newspaper primarily because the newspaper was sponsored by the school. "[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S.Ct. 562.
 
 
 55
 Defendants do not contend the Foxworthy shirt contained indecent language; nor was the shirt school-sponsored. Accordingly, under Saxe, the shirt "is subject to Tinker's general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others." Saxe, 240 F.3d at 214. Like the armbands at issue in Tinker, the wearing of the T-shirt was "akin to `pure speech,'" targeted for its expressive content. 393 U.S. at 508, 89 S.Ct. 733.
 
 
 56
 
 b. Banning the Foxworthy T-shirt.
 
 
 
 57
 Several cases have addressed public schools' attempts to restrict displays of the Confederate flag under Tinker. Where there have been racial problems involving the Confederate flag, courts have found such bans constitutional. See West, 206 F.3d at 1366; Melton v. Young, 465 F.2d 1332, 1335 (6th Cir.1972); Phillips v. Anderson County Sch. Dist. 5, 987 F.Supp. 488, 493 (D.S.C.1997). In the absence of such evidence, courts have concluded that school authorities have failed to establish a sufficient likelihood of disruption to support banning the flag. See Castorina ex rel. Rewt v. Madison County Sch. Bd., 246 F.3d 536, 542 (6th Cir.2001) (reversing summary judgment for school officials where there was no showing of disruption); Denno v. Sch. Bd., 182 F.3d 780, 785 (11th Cir.1999) ("noting the absence of any facts in the complaint that would suggest a reasonable fear of disruption"), vacated and decided on separate grounds, 218 F.3d 1267 (2000).
 
 
 58
 Here, there is substantial evidence of prior disruption related to the Confederate flag. The District Court's factual findings would likely support a ban of displays of the Confederate flag under Tinker. The "comprehensive authority of ... school officials... to prescribe and control conduct in the schools" would permit Warren Hills officials to prohibit the display of symbols whose display has had the purpose and effect of provoking disruption in school. Tinker, 393 U.S. at 507, 89 S.Ct. 733. But Plaintiffs have not challenged a ban on the Confederate flag; they challenge the banning of a T-shirt that bore no Confederate flag and had no similarly disruptive history. The evidence shows the Foxworthy T-shirt was worn several times without incident. On March 22, 2001, when Thomas Sypniewski wore the shirt, it created no disruption in the high school for nearly the entire day, until the last period, when he was sent to Vice Principal Griffith's office not because of disruption, but because of the view of a security guard that the shirt might violate the dress code or the racial harassment policy. Furthermore, the day after Thomas Sypniewski's suspension, school officials determined the shirt was not offensive when worn by Brian Sypniewski.
 
 
 59
 While the history of the Sypniewskis wearing the T-shirt speaks strongly against a finding of likelihood of disruption, it is not necessarily the case that school officials could never regulate it. There may be other bases for a "well-founded expectation of disruption." Saxe, 240 F.3d at 212. If so, the school district had "the power to act to prevent problems before they occurred; it was not limited to prohibiting and punishing conduct only after it caused a disturbance." West, 206 F.3d at 1367. In Saxe, we noted that an expectation of disruption will most likely be "well-founded" where there have been "past incidents arising out of similar speech."[11] 240 F.3d at 212. There were, of course, serious disruptive incidents in the Warren Hills schools over the two years before the decision to ban the Foxworthy T-shirt that justified banning a range of related expression. But we must determine whether that range is broad enough to encompass the Foxworthy T-shirt. The question is whether those incidents involved sufficiently "similar" — or otherwise related — speech to permit an inference of substantial disruption from the T-shirt.
 
 
 60
 Defendants contend the shirt was offensive — and consequently potentially disruptive — because in the context of the racial troubles in the Warren Hills schools, the word "redneck" had come to connote racial intolerance. They maintain the word "redneck" was directly associated with the Hicks and with the ongoing racial harassment. They also contend the word "redneck" is sufficiently related to words and symbols associated with the racial hostilities that the school authorities were entitled to expect that a shirt bearing that word would disrupt school functions.
 
 
 61
 Defendants claim the word "redneck" was an identifier of the Hicks, or an alternate name for the Hicks. If this is correct, then one should analyze clothing bearing the word "redneck" as one would clothing bearing the word "hick" or the Confederate flag. All had become, on defendants' view, gang signifiers. As such, the school district believed it was well within its rights to ban this clothing as a way of limiting gang-like activity in the schools.[12]
 
 
 62
 At best, the evidence is conflicting with respect to the direct association of the term "redneck" with the racial hostility and the troublemakers. There is little doubt the racial incidents involved a group known as "the Hicks." Both Superintendent Merluzzi and Vice Principal Griffith averred the group was also known as "the Rednecks." But there is no other evidence of that label being used for the Hicks. An editorial in the student newspaper, in October 2000, stated that Thomas Sypniewski associated the Confederate flag "with the words `red-neck' and `hick' (a term by which he and his friends refer to themselves.)" While this statement draws a connection between the two terms, it seems to imply that only "hick" is the term by which the students referred to themselves. At best the reference is ambiguous. By contrast, the gang-like group is called "the Hicks" in numerous references in the record. More importantly, the District Court made no finding that the group was ever known as the "Rednecks." Instead, assuming the group was known only as the "Hicks," the District Court relied on the relationship between the word "redneck" and the word "hick" to find that "redneck" was potentially disruptive. On this record, and in the absence of a finding by the District Court, we see no basis for concluding that the Hicks were also known as "the Rednecks." Therefore, defendants have not established their ability to ban the shirt as a gang or quasi-gang symbol.
 
 
 63
 Similarly, there is little or no evidence that the word "redneck" had been used to harass or intimidate, or otherwise to offend. Although on prior occasions, Thomas Sypniewski wore a shirt on which the word "redneck" appeared overlaid with the Confederate flag, the appearance of the word on the T-shirt with a flag does not make the word offensive. It is apparent from the record that students wearing Confederate flag clothing wore a variety of garments. Some may have displayed musicians, as did the T-shirt at issue in Castorina, 246 F.3d at 538 (T-shirt with Confederate flag and country music artist Hank Williams, Jr.). But that alone would not make the musician into a prohibited symbol. There is no suggestion in the record that any part of the Confederate flag clothing other than the flag itself was seen as a provocative and offensive symbol. In short, there is little if any history of the use of the word "redneck" itself that would support its ban.
 
 
 64
 Because of this, the District Court did not base its decision on the history of the use of the word "redneck" in Warren Hills schools. Instead, the District Court found justification for its ban in its "similarity" to the word "hick" and to the Confederate flag:
 
 
 65
 [T]he term "hick," which is a label for the group responsible for such occurrences as White Power Wednesdays, is quite similar to the term "redneck." This similarity is the case even if Thomas understands "hick" to mean a farmer as well as "redneck" to mean "a non-sophisticated person who likes to work and play in the outdoors".... It also exists regardless of any appropriate use of the term "redneck" in the general culture. The Court further finds similarities between the banned Confederate flag and the term "redneck" as well, indicated, for instance, by German's complaint about a shirt with both the words "redneck" and a Confederate flag.... These findings, given the similarity between the Confederate flag and the term "redneck," would also justify the banning of the term "redneck" as it appears on the Foxworthy T-shirt. Given the past history at the High School and the similarity between the word "redneck" and past incidents, the Court concludes that Plaintiffs have not demonstrated a sufficient probability of success as to the prohibition of the Foxworthy T-shirt under the Tinker substantial disruption standard....
 
 
 66
 Sypniewski, No. 01-3061, at 68-70.
 
 
 67
 With respect to the word "hick," the District Court focused on definitional similarity, noting that Webster's Third New International Dictionary defines a "redneck" as "a white member of the Southern rural laboring class," and defines a "hick" as "an awkward, rude, unsophisticated, or provincial person." Id. at 68 n. 23. It may be that, at least in some of their uses, the words "redneck" and "hick" have similar meanings. At least one thesaurus lists "hick" as a synonym of "red-neck." Merriam-Webster Collegiate Thesaurus. But that same thesaurus also lists "rustic," "bumpkin," "hillbilly," and "peasant," among others. Id. There is no reason to believe that any of these terms might cause a disturbance.
 
 
 68
 The offensiveness of "hick" in the present context derives not from its meaning,[13] but from its relationship to the gang-like group, the Hicks. Other words do not necessarily become offensive by being synonymous with such symbols. A word might well become offensive if it also served as an identifier of the Hicks (or a similar group), or as a promoter of the Hicks' disruptive behavior. Ultimately,then, "redneck" and "hick" must be "similar" not definitionally, but with respect to their associations with a disruptive group and its disruptive behavior. This is a kind of similarity that might support an inference of disruption. Otherwise, we would be required to conclude that the school could also ban "hillbilly," "peasant," and the like.
 
 
 69
 It could be argued that the synonymity of the words is relevant insofar as they both imply, in certain of their uses, racial intolerance and bigotry. The wearing of the Foxworthy T-shirt, then, might be seen as a veiled celebration of bigotry. But there is no evidence that "redneck" had or has such a meaning in the Warren Hills schools. The evidence reveals a history of unproblematic use of the word, and that it was not associated to a significant degree with the Hicks or with their behavior. The most that could be said, given the District Court's findings on this issue, is that "redneck" might come to be offensive. Yet this does not amount to a well-founded fear of disturbance, but merely an undifferentiated fear or remote apprehension of disturbance. See Tinker, 393 U.S. at 508, 89 S.Ct. 733.
 
 
 70
 It may be argued the school was entitled to conclude the T-shirt was likely to lead to disruption because Thomas Sypniewski's wearing of the shirt amounted to a promotion of values consistent with the items and activities that had caused racial unrest. Again, mere association is not enough. Arguably, this reasoning could encompass country music and any number of things identifiably "country." The First Amendment would have little meaning if schools could go that far.
 
 
 71
 Where a school seeks to suppress a term merely related to an expression that has proven to be disruptive, it must do more than simply point to a general association. It must point to a particular and concrete basis for concluding that the association is strong enough to give rise to well-founded fear of genuine disruption in the form of substantially interfering with school operations or with the rights of others. In other words, it is not enough that speech is generally similar to speech involved in past incidents of disruption, it must be similar in the right way. Most commonly, the prior speech will have carried an offensive or provocative meaning, and the similar speech will have a similar meaning. But this sense of "similarity" cannot justify the ban here. The most plausible kind of similarity that would permit such an inference would be that the word "redneck" was akin to a gang symbol identifying the Hicks, or clearly promoting their activities. But as discussed, the record does not support such a conclusion, and the District Court made no such finding. On this record, therefore, plaintiffs have established a likelihood of success on the merits of their First Amendment claim with respect to the Foxworthy T-shirt. The District Court erred in employing too broad a notion of "similarity" — a conception that does not provide a sufficient basis for permitting a "well-founded" inference of disruption.
 
 
 72
 In order to grant a preliminary injunction, the District Court must also assess whether either party would suffer irreparable injury as a result of granting or denying the injunction, the balance of the hardships, and the public interest.
 
 
 73
 Both sides have plausible claims for irreparable injury. A student whose protected expression is stifled suffers an injury that cannot be undone. And if the school is unable to enforce a policy it needs to provide education and to maintain discipline, the disruption of education or the invasion of other students' rights cannot be reversed. Both kinds of injuries are substantial. Thus, neither the irreparability of the injuries nor the balance of the injuries modifies the outcome in any significant way. Finally, the public interest demands respect for both constitutional rights and effective education. For these reasons, the likelihood of success on the merits, determines the result of the analysis.
 
 
 74
 The District Court erred in denying the preliminary injunction sought against enforcement of the racial harassment policy to prohibit the wearing of the Foxworthy T-shirt.
 
 
 75
 
 c. Facial Challenge to the Harassment Policy.
 
 
 
 76
 In addition to challenging the racial harassment policy as applied to the Foxworthy T-shirt, plaintiffs maintain it should be struck down in its entirety for several reasons. First, plaintiffs argue the policy as a whole is facially overbroad. A policy regulating expression can be struck down entirely if it proscribes a significant amount of constitutionally protected speech. Second, they contend the policy is so vague as to be facially unconstitutional. A sufficiently vague policy may fail to put students on fair notice of what is prohibited and provides insufficient standards for enforcement. Finally, plaintiffs maintain the policy is unconstitutional insofar as it amounts to content-based discrimination.
 
 
 77
 
 i. Overbreadth.
 
 
 
 78
 A regulation of speech[14] may be struck down on its face if its prohibitions are sufficiently overbroad — that is, if it reaches too much expression that is protected by the Constitution. The harassment policy can be found unconstitutionally overbroad if "there is a `likelihood that the statute's very existence will inhibit free expression'" to a substantial extent. Saxe, 240 F.3d at 214 (quoting Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).
 
 
 79
 In most cases, courts will not assess the constitutionality of a provision apart from its particular applications. But cases involving freedom of speech are frequently excepted from this general rule. Los Angeles Police Dept. v. United Reporting Publ'g Corp., 528 U.S. 32, 38, 120 S.Ct.483, 145 L.Ed.2d 451 (1999). The exception, however, is a narrow one:
 
 
 80
 Even though the challenge be based on the First Amendment, the overbreadth doctrine is not casually employed. "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is `strong medicine' and have employed it with hesitation, and then `only as a last resort.'"
 
 
 81
 Id. at 39, 120 S.Ct. 483 (quoting New York v. Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). Accordingly, most cases alleging unconstitutional enforcement of a public school's disciplinary policies, like other laws, "are best addressed when (and if) they arise, rather than prophylactically through the disfavored mechanism of a facial challenge." City of Chicago v. Morales, 527 U.S. 41, 111, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Thomas, J., dissenting). For these reasons, courts will not strike down a regulation as overbroad unless the overbreadth is "substantial in relation to the [regulation's] plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).
 
 
 82
 Furthermore, in response to an overbreadth challenge, a policy can be struck down only if no reasonable limiting construction is available that would render the policy constitutional. Saxe, 240 F.3d at 215. "[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." Id. (quoting Stretton v. Disciplinary Bd. of the Supreme Court, 944 F.2d 137, 144 (3d Cir.1991)); see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n. 4, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). A court, however, "will not rewrite a ... law to conform it to constitutional requirements." Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); Reno v. ACLU, 521 U.S. 844, 884-85, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Accordingly, we must determine whether the relatively broad language of the policy can reasonably be viewed narrowly enough to avoid any overbreadth problem.
 
 
 83
 Because of the duties and responsibilities of the public elementary and secondary schools, the overbreadth doctrine warrants a more hesitant application in this setting than in other contexts. There are important reasons for this. First, Tinker acknowledges what common sense tells us: a much broader "plainly legitimate" area of speech can be regulated at school than outside school. Speech that disrupts education, causes disorder, or inappropriately interferes with other students' rights may be proscribed or regulated. 393 U.S. at 513, 89 S.Ct. 733. Everyday school discipline does not depend on the necessity of a speech code. In the public school setting, the First Amendment protects the nondisruptive expression of ideas. It does not erect a shield that handicaps the proper functioning of the public schools.[15]
 
 
 84
 This fact is also recognized by New Jersey law. By statute, school authorities are required to "hold every pupil accountable for disorderly conduct," and any student who disobeys a school official may be subject "to punishment and to suspension or expulsion from school." N.J. Stat. Ann. § 18A:25-2, 37-2. Accordingly, expression that constitutes "disorderly conduct" is proscribed by New Jersey law and can result in discipline including suspension. It is apparent, therefore, that most racially hostile conduct could be regulated and punished even without a racial harassment speech code, so long as it is disruptive.[16] Though not generally necessary, more specific provisions can serve an important purpose. A school might conclude a generic policy would have less value in guiding school children's behavior. The broad authority to control the conduct of students granted to school officials permits a good deal of latitude in determining which policies will best serve educational and disciplinary goals.
 
 
 85
 Also, the demands of public secondary and elementary school discipline are such that it is inappropriate to expect the same level of precision in drafting school disciplinary policies as is expected of legislative bodies crafting criminal restrictions. Cf. Fraser, 478 U.S. at 686, 106 S.Ct. 3159 ("Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.") (discussing vagueness). New Jersey Board of Education regulations provide that "[e]ach district board of education shall develop and implement a code of conduct for establishing school standards and rules which define acceptable student behavioral expectations and which govern student behavior." N.J. Admin. Code tit. 6A § 16-5.1. The Warren Hills code is typical in its generality, requiring that students "at all times conduct themselves in a manner that is cooperative, respectful, and responsive to staff and administration." Warren Hills Regional High School Student/Parent Handbook 2002-2003, at 19. The code prohibits, among other behaviors, "abusive language," "[i]nsubordination," "disrespect towards a staff member or other adult in the building," and "[a]ny unlisted offense to be decided by an administrator." Id. at 20. Determining the appropriate level of detail in a school disciplinary code is largely left to school officials.
 
 
 86
 Yet there is another important consideration here. Speech codes are disfavored under the First Amendment because of their tendency to silence or interfere with protected speech. See, e.g., Saxe, 240 F.3d at 207 ("This sort of content-or viewpoint-based restriction is ordinarily subject to the most exacting First Amendment scrutiny."); Dambrot v. Cent. Mich. Univ., 55 F.3d 1177, 1182-84 (1995); cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 391, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (bias-motivated disorderly conduct statute). But for the reasons discussed, public secondary and elementary school administrators are granted more leeway than public colleges and universities or legislative bodies, e.g., municipalities, states, and Congress. Accordingly, a school disciplinary policy will be struck down as overbroad only after consideration of the special needs of school discipline has been brought to bear together with the law's general hesitation to apply this "strong medicine."
 
 
 87
 We now turn to the challenged racial harassment policy.[17] The Warren Hills Harassment Policy prohibits harassing or intimidating utterances ("name calling" and "using racial or derogatory slurs") as well as the display or even possession of racially offensive material. Such materials can be banned if they "depict[] or imply[] racial hatred or prejudice," if they are "racially divisive," or if they "create[] ill will or hatred."
 
 
 88
 Plaintiffs argue the unconstitutionality of the policy is directly mandated by Saxe, in which this court found overbroad a harassment policy plaintiffs maintain was "substantially identical" to the one at issue here. But we think the Warren Hills language is sufficiently different from[18] — and narrower than — the language found by Saxe to be too broad that the policy requires independent evaluation.[19]
 
 
 89
 Additionally, in Saxe, we noted the breadth of the policy's statement of purpose, which stated that "[m]embers of the school community are expected to treat each other with mutual respect" and that "[d]isrespect among members of the school community is unacceptable behavior." 240 F.3d at 217 n. 12. These statements made clear that much more was sought to be avoided than the kind of disruption that justifies speech regulation under Tinker.[20] Here, the history of racial hostility demonstrates the policy was intended to address a particular and concrete set of problems involving genuine disruption — not merely lack of mutual respect.
 
 
 90
 In any event, the policy here differs from Saxe not only in language, but also in the circumstances it addresses. The history of racial difficulties in Warren Hills provides a substantial basis for legitimately fearing disruption from the kind of speech prohibited by the policy. By contrast, in Saxe, there was no evidence that the policy was adopted in response to any particular events.[21] The lack of a similar history was at least partially responsible for our finding the harassment policy in Saxe unconstitutional. We distinguished West because the school district there had "demonstrated a concrete threat of substantial disruption." 240 F.3d at 212. In the absence of such a history, the fear of disruption is likely to be no more than "undifferentiated fear or apprehension of disturbance." The school district in Saxe "fail[ed] to provide any particularized reason as to why it anticipate[d] substantial disruption from the broad swath of student speech prohibited under the Policy." Id. at 217. By contrast, defendants here have presented substantial evidence of disruption that constitutes a solid foundation for fear of future disruption.
 
 
 91
 Nonetheless, the language of the Warren Hills policy appears to cover speech that is not subject to lawful regulation under Tinker. Understood broadly, it seems likely there will be a good deal of speech that creates "ill will" that does not substantially interfere with the rights of other students or with the operation of the school as an educational institution. There may also be some harassment "by name calling" that does not genuinely threaten disruption. The question then is whether the policy can reasonably be interpreted to avoid this apparent constitutional problem.
 
 
 92
 The District Court employed an interpretation that read a disruption requirement into the policy, requiring that the offensive material be "such that the school has a specific and well-founded fear that it will substantially disrupt or interfere with the work of the school or the rights of other students."[22] Defendants contend the court's interpretation is unreasonable insofar as it amounts to "rewrit[ing] [the policy] to conform it to constitutional requirements," Am. Booksellers, 484 U.S. at 397, 108 S.Ct. 636, by adding a requirement not found anywhere in the text of the policy.
 
 
 93
 We believe the District Court's reading goes beyond the scope of permissible interpretations of the policy. The text provides no support for the added requirement. Nowhere is disruption, or any like term, mentioned. Nor is there language in the policy suggesting that school officials should make an assessment of the kinds of disruptive effects that can justify speech regulation under Tinker.[23] As written, the policy proscribes "name calling," "racial prejudice," and "ill will," independent of any possible disruption. Without a more substantial textual anchor, the language cannot be stretched to include an independent disruption requirement without rewriting the policy. We did not consider this kind of modification in Saxe, nor do we know of any other court that has so modified a school speech policy.
 
 
 94
 We look then to the text of the racial harassment policy to determine whether the policy can be interpreted sufficiently narrowly that it does not ban speech protected under Tinker.[24] The policy begins, "District employees and student(s) shall not racially harass or intimidate other student(s) or employee(s) by name calling, using racial or derogatory slurs, wearing or possession of items depicting or implying racial hatred or prejudice." On its face, it appears the phrase "name calling" may be over broad. This category would seem to include much expression that is either relatively benign, or is protected political expression. But the entire sentence makes clear that what is prohibited is not (to take one of these categories) name calling in general, but racial harassment or intimidation by name calling. More benign forms of name calling are not included.
 
 
 95
 Intimidation of one student by another, including intimidation by name calling, is the kind of behavior school authorities are expected to control or prevent. There is no constitutional right to be a bully. On the other hand, confining prohibited speech to that which constitutes "harassment" is not alone sufficient to ensure constitutionality. In Saxe, we noted that "harassment," when targeted on the basis of its expressive content, encompasses speech within the area protected by the First Amendment. 240 F.3d at 209. We found the definition of "harassment" employed there to be unconstitutionally broad, in large part because it encompassed expression not subject to regulation under Tinker. Id. at 216-17. Thus, in this case, a particular form of harassment or intimidation can be regulated by defendants only if it meets the requirements of Tinker; that is, if the speech at issue gives rise to a well-founded fear of disruption or interference with the rights of others.
 
 
 96
 In assessing the likelihood of disruption of racially provocative speech, the state of racial relations in the school is particularly relevant. "Racial harassment or intimidation by name calling" is more likely disruptive in the Warren Hills schools than elsewhere. Certain kinds of name calling — like racial slurs — will be especially likely to disrupt. The policy separately speaks of "using racial or derogatory slurs." So if "name calling" is to have any independent effect, something broader must be meant by "name calling" than "using racial or derogatory slurs." And it is less clear that a run-of-the-mill insult made to a person of a different race, for instance, will necessarily give rise to a genuine concern of disruption.
 
 
 97
 Although mere offense is not a justification for suppression of speech, schools are generally permitted to step in and protect students from abuse. Even where harassment by name calling does not involve a racial component, and even where there is no special history of disruption, prohibition accompanied by the threat of sanction is — and has always been — a standard school response. Students cannot hide behind the First Amendment to protect their "right" to abuse and intimidate other students at school. Outside the school context, of course, much harassment by name calling (understood broadly) is protected. But the First Amendment does not interfere with basic school discipline. Consequently, in a racially charged environment, a school may prevent racially provocative harassment by name calling.[25]
 
 
 98
 More problematic is the phrase "creates ill will" in the second sentence of the policy, which reads, "District employees and students shall not at school, on school property or at school activities wear or have in their possession any written material, either printed or in their own handwriting, that is racially divisive or creates ill will or hatred." The focus of this phrase is entirely on the reaction of listeners. But by itself, an idea's generating ill will is not a sufficient basis for suppressing its expression. "The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected." R.A.V., 505 U.S. at 414, 112 S.Ct. 2538 (White, J., concurring); see also Saxe, 240 F.3d at 215 ("The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it."). What is required is that the school has a well-founded fear that the material at issue "would substantially disrupt or interfere with the work of the school or the rights of other students." Id. at 211. And disruption for purposes of Tinker must be more than "the discomfort and unpleasantness that always accompany an unpopular viewpoint." Tinker, 393 U.S. at 509, 89 S.Ct. 733. As a general matter, protecting expression that gives rise to ill will — and nothing more — is at the core of the First Amendment.
 
 
 99
 It might be argued that "ill will" connotes something more than mere offense — a kind of hostility to the speaker that has a real likelihood of developing into conflict. Such an inference, however, would be fair only if "ill will" were construed so narrowly as to lose its ordinary sense. By contrast, such an argument would likely be more suitable with respect to racial "hatred." For "hatred" implies such strong feelings that a serious possibility of disruption might be inferred. But the inclusion of the stronger term "hatred" in the policy implies that the broader term "ill will" should be given its ordinary sense. And in its ordinary sense, no similar inference is reasonable. Accordingly, if "ill will" is to have any effect in the policy, it expands the policy too far into the domain of protected expression.
 
 
 100
 Another useful comparison is with the policy's prohibition on "racially divisive" materials. Racial divisiveness connotes something more than a listener's negative response to the expression. There is a notion of conflict implicit in the phrase. It suggests a mutual antagonism between competing individuals or groups of people that could erupt into genuine hostilities. And where a school has experienced a history of racial difficulties, it is more likely entitled to conclude that racially divisive material is a genuine threat to the proper maintenance of order and discipline.
 
 
 101
 Plaintiffs suggest the phrase "racially divisive" is itself too broad, because certain clearly protected expression, such as discussions of affirmative action, in or out of the classroom, might be thought to be racially divisive. This may be so in some sense, but the racially divisive material must also be harassing or intimidating to be prohibited. For this reason, it is hard to view even a heated discussion of affirmative action as amounting to harassment or intimidation. In any event, we are confident the policy would not require the suppression of genuine political, social or academic discussions that reveal strongly held views on matters like affirmative action.
 
 
 102
 In short, given the state of racial relations in Warren Hills, defendants appear to have a genuine and well-founded basis for fearing disruption by most — but not all — of the expression prohibited by the policy. But one provision creates an overbreadth problem of sufficient magnitude that it must be stricken from the policy. That part of the policy directed at material that "creates ill will" is unconstitutional.
 
 
 103
 Stripped of this phrase, the remaining policy is constitutionally permissible in the context of the Warren Hills School District and its recent unpleasant history. This reliance on the background of turmoil at a particular place and a particular time means that the policy would likely be unconstitutional in another school district, or even in Warren Hills at a different time. Viewed one way, this is not troubling. Especially in the school setting, restrictive policies are appropriately targeted to the special features of the given context. What is necessary in one school at one time will not be necessary elsewhere and at other times. Schools require the flexibility to deal with problems as they arise. But the possibility that the policy may become unconstitutional is clearly an undesirable feature. A policy might avoid this problem by more directly addressing the factors that justify the school's regulation of the speech. The District Court's approach would go a long way in achieving this result, but it might be addressed in any number of ways. Nonetheless, as modified, defendants have sufficiently established, at this juncture, a likelihood of establishing that the harassment policy's "restrictions are necessary to prevent substantial disruption or interference with the work of the school or the rights of other students." Saxe, 240 F.3d at 216. They may continue to enforce the policy so modified.
 
 
 104
 
 ii. Vagueness.
 
 
 
 105
 When the language of a regulation is vague, speakers are left to guess as to the contours of its proscriptions. They are left without "fair notice" of the regulation's reach. Commonly, this uncertainty will lead them to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (citation omitted). The need for specificity is especially important where, as here, the regulation at issue is a "content-based regulation of speech. The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." Reno v. ACLU, 521 U.S. at 871-72, 117 S.Ct. 2329. There is also a second, "more important aspect of vagueness doctrine" Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). A vague rule "may authorize and even encourage arbitrary and discriminatory enforcement," Morales, 527 U.S. at 56, 119 S.Ct. 1849, by failing to "establish minimal guidelines to govern ... enforcement." Kolender, 461 U.S. at 358, 103 S.Ct. 1855.
 
 
 106
 When addressing school disciplinary rules, courts have been less demanding of specificity than they have when assessing the constitutionality of other regulations, such as criminal statutes. As we have noted, because schools need the authority to control such a wide range of disruptive behavior, "school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." Fraser, 478 U.S. at 686, 106 S.Ct. 3159. Accordingly, school disciplinary rules will be struck down on this basis only when the vagueness is especially problematic.
 
 
 107
 The portions of the policy plaintiffs contend are unconstitutionally vague are imprecise. "Racially divisive" and "hatred and ill will" are phrases subject to a range of interpretations. But "there are limitations in the English language with respect to being both specific and manageably brief." U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 578-79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). The challenged phrases are "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." Id. at 579, 93 S.Ct. 2880. The policy is not vague "in the sense that no standard of conduct is specified at all," but "in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard." Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). Only the phrase "ill will" presents an arguable vagueness concern, but because we have found it to be constitutionally unsuitable for other reasons, we need not assess its precision for constitutionality. For public elementary and secondary school disciplinary rules, the language of the racial harassment policy is specific enough to give fair notice to the students and to provide school officials with standards by which to enforce the policy.
 
 
 108
 
 iii. Content Discrimination.
 
 
 
 109
 Plaintiffs contend the policy is not only vague and overbroad, but is also, in a sense, too narrow. Because the policy restricts only speech that expresses racially oriented themes, plaintiffs contend the policy amounts to content discrimination.
 
 
 110
 "Content-based regulations are presumptively invalid." R.A.V., 505 U.S. at 382, 112 S.Ct. 2538. This is true even where the regulation restricts only expression that can constitutionally be suppressed under the First Amendment. In R.A.V., for example, the Supreme Court struck down a law that criminalized "bias-motivated" fighting words. Even though the speech at issue might have been regulated as fighting words, the Supreme Court held the law unconstitutional because it picked out only those fighting words that "arouse[] anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." Id. at 380, 112 S.Ct. 2538; St. Paul, Minn. Legis. Code § 292.02 (1990). The Court concluded that by limiting the applicability of the law to certain expression on the basis of its content, the city had engaged in "content discrimination." R.A.V., 505 U.S. at 387, 112 S.Ct. 2538.
 
 
 111
 Plaintiffs contend that by targeting only racially provocative expression, Warren Hills has singled out for sanction a particular class of speech based on its content. While the school district has the right to sanction speech that is disruptive, plaintiffs contend that under R.A.V., it is not permitted to discriminate between disruptive speech that has racial elements and disruptive speech that does not.
 
 
 112
 The racial harassment policy is indisputably a content-based restriction on expression, and in other contexts, may well be found unconstitutional under R.A.V. But as discussed, the public school setting is fundamentally different from other contexts, including the university setting.[26] Primary and secondary school officials stand in a unique relationship with respect to their students, most of whom are minors. They are charged with the basic education of the nation's youth, which is "perhaps the most important function of state and local governments." Brown v. Bd. of Ed., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). This task requires not simply enforcement, but "shaping the students' experience to achieve educational goals," Ambach v. Norwick, 441 U.S. 68, 78, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979), which include "inculcating fundamental values necessary to the maintenance of a democratic political system." Id. at 77, 99 S.Ct. 1589. Further, "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." Hazelwood, 484 U.S. at 273, 108 S.Ct. 562. A crucial element of that responsibility is maintaining an environment conducive to fulfilling the state's educational mission. Accordingly, "conduct by the student, in class or out of it, which for any reason — whether it stems from time, place, or type of behavior — materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Tinker, 393 U.S. at 513, 89 S.Ct. 733. And importantly, school officials are granted "comprehensive authority... to prescribe and control conduct in the schools." Id. at 507, 89 S.Ct. 733. Courts have long recognized the need to grant schools a degree of flexibility in identifying conduct that disrupts education or violates principles central to their mission. For this reason, courts have recognized a similar need for flexibility in adopting responses to those perceived problems.
 
 
 113
 When due respect is paid to the needs of school authority, it becomes clear the focus on racial expression in this case is justifiable. When a school has identified a class of speech that, because of its content, is subject to a well-founded fear of conflict, it should be allowed to prescribe clear rules that students are capable of following to the degree necessary to maintain order. The "comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools" requires the ability to implement rules of conduct viewed by school officials as capable of adequately guiding the behavior of students and administrators. Tinker, 393 U.S. at 507, 89 S.Ct. 733.
 
 
 114
 We believe that Tinker and its progeny provide the principal mode of analysis in this area. It is not entirely clear what implications R.A.V.'s "underbreadth" analysis has for public school disciplinary policies.[27] In any event, we need not resolve this question because it is clear that adopting a policy limited to racially provocative speech was an acceptable non-discriminatory response by school authorities to the history of race relations in Warren Hills schools. Therefore, while a similar policy may be found unconstitutional on this basis in other contexts, the policy does not amount to "content discrimination" in violation of the First Amendment within the context of these public schools.
 
 IV.
 
 115
 We recognize the challenges faced by school officials when attempting to adopt disciplinary policies directed at racial harassment. The need to respect the rights of students requires a careful balancing. On the one hand, speech codes are disfavored for their tendency to interfere with or silence protected speech. Students should not be prevented from engaging in nondisruptive speech. But when there is a concrete basis — ordinarily established by a history of disruption and interference with the legitimate rights of other students — for concluding that certain expression presents a well-founded fear of disruption, a school should be free to address the issue by adopting a formal policy, so long as the policy narrowly targets the identified problems. When policies focus broadly on listeners' reactions, without providing a basis for limiting application to disruptive expression, they are likely to cover a substantial amount of protected speech. Here, the inclusion of the phrase "creates ill will" causes just such a problem.
 
 
 116
 Defendants have made a good faith effort to respond to a serious disciplinary problem without unduly restricting students' expression. Nevertheless, the application of the policy to the Foxworthy T-shirt appears to go too far. Defendants have not, on this record, established that the shirt might genuinely threaten disruption or, indeed, that it violated any of the particular provisions of the harassment policy (excepting, perhaps, the "ill will" provision).
 
 
 117
 Accordingly, we will reverse the District Court to the extent it refused to enjoin further application of the racial harassment policy to the Foxworthy T-shirt, and to the extent it permitted further enforcement of the policy's "ill will" provision.
 
 
 
 Notes:
 
 
 *
 The Honorable Robert J. Ward, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Thomas Sypniewski was a student at the Warren Hills Regional High School until June 15, 2001 (ten days before plaintiffs filed their complaint), when he graduated. Brian Sypniewski was a student at the Warren Hills Regional Middle School until June 2001. He entered the high school in September 2001. Matthew Sypniewski is a student at the high school and at the Warren County Technical School and is scheduled to graduate in 2004
 
 
 [2]
 The District Court's opinion contains a comprehensive discussion of the racial troubles in the Warren Hills School DistrictSee Sypniewski v. Warren Hills Reg. Bd. of Ed., No. 01-3061, 5-22 & 32-37 (D.N.J. Sept. 4, 2001)
 
 
 [3]
 In particular, the report includes the following findings:
 
 
 [1]
 There is a sizable number of students, both minority and majority, who feel offended, threatened, uncomfortable and discriminated against by the displaying of the Confederate flag in non teaching capacities
 
 
 [2]
 There is strong evidence that a demonstration of "white power" was the intention of the boy who displayed the flag[in the hallway on September 20, 2000]
 
 
 [3]
 The students who consider themselves members of the clique known as the "Hicks" share a common belief in prejudicial feelings towards others
 
 
 [4]
 The "Hicks" celebrate "White Wednesday" by wearing tee-shirts as a symbol of solidarity. The shirts of choice have a representation of the Confederate flag in some form or fashion
 
 
 [5]
 One of the students involved in the flag demonstration downloaded racially offensive literature from the internet from a web site called "whitesonly.com" and distributed these materials to the students in the school community
 
 
 [4]
 The Warren Hills policy and the one at issue in West are substantively identical except for the addition, in the Warren Hills policy, of the second paragraph quoted
 
 
 [5]
 See note 1, supra.
 
 
 [6]
 The dress code provides:
 Students also have the responsibility to dress appropriately and to keep themselves, their clothes and their hair clean. School officials may impose limitations on student participation in the regular instructional program where there is evidence that inappropriate dress causes disruption in the classroom and the lack of cleanliness constitutes a health or safety hazard or disruption of the educational program. The following is considered inappropriate for school:
 a) Clothing displaying or imprinted with nudity, vulgarity, obscenity, profanity, double entendre pictures or slogans (including those related to alcohol, drugs and tobacco), or portraying racial, ethnic, or religious stereotyping.
 b) Flip-flops, thongs, and other hazardous footwear.
 c) Clothing which has been intentionally torn, cut, or ripped in a fashion which displays the anatomy.
 d) Spandex garments without additional outer clothing.
 e) Any clothing deemed gang-related, including the way the clothing is worn.
 f) Gym-type apparel, clothing intended as undergarments worn as outer garments, or see-through garments without appropriate undergarments.
 g) Street coats, windbreakers, and head coverings worn in the building. These items should be placed in lockers immediately upon arrival. Exceptions for medical or religious reasons must be referred to the principal.
 h) Bare midriff clothing.
 
 
 [7]
 The Bud Bowl is a fictional football game between bottles of beer used in a beer advertising campaign
 
 
 [8]
 Hooters is a national restaurant chain that liberally employs sexuality in its marketing
 
 
 [9]
 The constitutionality of the dress code policy has not been raised on appeal
 
 
 [10]
 The order appealed is not a final order. Nonetheless, we have jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1), which grants appellate jurisdiction over "[i]nterlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing, or dissolving injunctions...."
 
 
 [11]
 While such evidence will most often be needed to show that an expectation of disruption is well-founded, there may be cases in which it is not required. The high school was likely justified in disciplining the student dressed in black face, wearing a rope around his neck, whether or not they could point to anything similar in the past. The Foxworthy T-shirt, however, is clearly not in this category. It is essentially harmless on its face
 
 
 [12]
 Plaintiffs maintain that even if the words and symbols were signifiers of the Hicks, there is no direct evidence that their wearing the T-shirt had or would cause any disruption. Such a showing, they argue, is required to justify a ban. In support of this position, plaintiffs citeChalifoux v. New Caney Independent School District, 976 F.Supp. 659 (S.D.Tex.1997), a case discussed favorably by this court in Saxe, 240 F.3d at 211-12. In Chalifoux, the school banned rosary beads as gang symbols. Two students neither affiliated with nor identified as members of the gang in question wore rosaries for religious purposes, but were disciplined. The court found the students could not be prevented from wearing the rosaries under those circumstances. 976 F.Supp. at 667.
 The facts here are somewhat different. First, the rosaries at issue in Chalifoux implicated the religious freedom of the plaintiffs. Id. at 665. Second, in Chalifoux, it was clear that plaintiffs were not gang members, and there was no reason for anyone to think otherwise. Id. at 663. The record here does not reveal a similarly clear disassociation. See supra, at 4.
 
 
 [13]
 Both "hick" and "redneck" can be used disparagingly, of course. But when they are used in this way, they offend the people labeled "hick" or "redneck."
 
 
 [14]
 While the harassment policy may be said to regulate conduct, it clearly regulates speech, insofar as it specifically targets certain expression
 
 
 [15]
 The Supreme Court has recognized that schools have a "compelling interest in having an undisrupted school session conducive to the students' learning."Grayned v. City of Rockford, 408 U.S. 104, 119, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
 
 
 [16]
 As we discuss, even in the public school context, mere offensiveness does not qualify as "disruptive" speech
 
 
 [17]
 Here again is the relevant portion of the harassment policy:
 District employees and student(s) shall not racially harass or intimidate other student(s) or employee(s) by name calling, using racial or derogatory slurs, wearing or possession of items depicting or implying racial hatred or prejudice. District employees and students shall not at school, on school property or at school activities wear or have in their possession any written material, either printed or in their own handwriting, that is racially divisive or creates ill will or hatred. (Examples: clothing, articles, material, publications or any item that denotes Ku Klux Klan, Arayan [sic] Nation-White Supremacy, Black Power, Confederate flags or articles, Neo-Nazi or any other "hate" group. This list is not intended to be all inclusive.)
 
 
 [18]
 Two paragraphs of theSaxe harassment policy are pertinent here:
 Harassment means verbal or physical conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics, and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment.
 . . . .
 Harassment can include any unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because of any of the characteristics described above. Such conduct includes, but is not limited to, unsolicited derogatory remarks, jokes, demeaning comments or behaviors, slurs, mimicking, name calling, graffiti, innuendo, gestures, physical contact, stalking, threatening, bullying, extorting or the display or circulation of written material or pictures.
 Saxe, 240 F.3d at 202-03.
 
 
 [19]
 InSaxe, we focused on two portions of the disputed policy that do not have identical siblings in the Warren Hills policy. First, the Saxe policy restricted conduct "which has the purpose or effect of substantially interfering with a student's educational performance." We noted that the "purpose" portion of that policy "ignores Tinker's requirement that a school must reasonably believe that speech will cause actual, material disruption before prohibiting it." 240 F.3d at 217. The Warren Hills policy contains no parallel language. Second, we found the language prohibiting speech that "creat[es] an intimidating, hostile or offensive environment" to encompass a substantial amount of protected speech, finding nothing in the policy requiring any level of severity or pervasiveness. Id. The language plaintiffs view as analogous here prohibits speech that causes "racial hatred or ill will." These concepts are similar, but it is not immediately apparent that the holding in Saxe governs the language here.
 Some of the language is, in fact, nearly identical. Both prohibit harassment "by name calling" and by using "racial ... slurs." But this particular language was not analyzed in Saxe, and consequently was not the basis for our concluding the policy was overbroad.
 
 
 [20]
 The defendant school board inSaxe has since adopted a modified version of the harassment policy. The new policy contains a narrower definition of harassment that includes references to disruption. The relevant portion of policy, as now published on the district's website, provides:
 The term "harassment" as used in the Policy means verbal, written, graphic or physical conduct which does or is reasonably believed under the totality of the circumstances to
 
 
 [1]
 substantially or materially interfere with a student's or students' educational performance; and/or
 
 
 [2]
 deny any student or students the benefits or opportunities offered by the School District; and/or
 
 
 [3]
 substantially disrupt school operations or activities; and/or
 
 
 [4]
 contain lewd, vulgar or profane expression; and/or
 
 
 [5]
 create a hostile or abusive environment which is of such pervasiveness and severity that it materially and adversely alters the condition of a student's or students' educational environment, from both an objective viewpoint and the subjective viewpoint of the student at whom the harassment is directed
 The term "harassment" for purposes of this Policy does not mean merely offensive expression, rudeness or discourtesy; nor does the term "harassment" mean the legitimate exercise of constitutional rights within the school setting. The School District recognizes there is a right to express opinion, ideas and beliefs so long as such expression is not lewd or profane or materially disruptive of school operations or the rights of others.
 http://www.scasd.k12.pa.us/policies/antihar-assment.html (visited Aug. 7, 2002).
 
 
 [21]
 InSaxe, the school district did not defend the policy on the basis of particular incidents that justified an increased expectation of disruption. It was legally challenged as facially unconstitutional shortly after its enactment by two students and their legal guardian who were concerned that the broad language would prevent them from expressing their religious views, especially their belief that homosexuality is sinful. Saxe, 240 F.3d at 203.
 
 
 [22]
 The District Court read the policy as implying the following requirements:
 (1) wearing or possession of any written material
 (2) that is either
 (2a) racially divisive or
 (2b) creates racial ill will or
 (2c) creates racial hatred and that
 (3) is such that the school has a specific and well-founded fear that it will substantially disrupt or interfere with the work of the school or the rights of other students.
 Sypniewski, No. 01-3061, at 56.
 
 
 [23]
 Notably, the dress code, which the District Court found to exceed constitutional limits, does contain language from which such a requirement might arguably be drawn: "School officials may impose limitations on student participation in the regular instructional program where there is evidence that inappropriate dress causes disruption in the classroom and the lack of cleanliness constitutes a health or safety hazard or disruption of the education program." The District Court did not assess the effect of this language, and we express no opinion on the constitutionality of this code
 
 
 [24]
 As noted, the challenged language was specifically upheld in the face of a facial attack by the Court of Appeals for the Tenth Circuit inWest. The court there found the policy was sufficiently narrow because it:
 permits the administrator to consider whether the student's conduct was willful, whether the student displayed the symbol in some manner, and whether the conduct had the effect of creating ill will, and the district does not interpret the policy to prohibit the use or possession of such symbols for legitimate educational purposes.
 206 F.3d at 1368.
 Unlike the District Court's interpretation, nothing in West amounts to adding a requirement not supported in the policy's text. The issue, then, is not whether the interpretation is reasonable, but whether it is sufficiently narrow to avoid substantial overbreadth.
 By themselves, the limitations in West do not appear to exclude all protected expression. Whether a student's conduct is willful does not necessarily alter its disruptive effects (although it may bear on the fairness of sanction). Cf. Saxe, 240 F.3d at 216 (finding overbreadth in policy that "punishes not only speech that actually causes disruption, but also speech that merely intends to do so"). And even when a symbol is actually displayed and actually causes ill will, it does not necessarily follow that substantial disruption will result. Consequently, these interpretive limitations do not provide a concrete basis for limiting application of the policy to fit within the range of proscribable speech delimited by Tinker. The question, then, is whether there are other bases for limiting the scope of the policy so that it fits within constitutional limits.
 
 
 [25]
 It is worth emphasizing again that our discussion here is limited to the issue of overbreadth. It is enough for these purposes that the speech regulated by the policy is speech the school can regulate. Plaintiffs argue the policy, in focusing on racial speech, unconstitutionally picks out certain disfavored speech for special sanction. This issue is discussed in subsection III(c)(iii),infra.
 
 
 [26]
 CompareDambrot, 55 F.3d at 1184, where the Court of Appeals for the Sixth Circuit applied R.A.V. in finding unconstitutional a public university's harassment policy. "Under R.A.V., the ... policy constitutes content discrimination because it necessarily requires the university to assess the racial or ethnic content of the speech."
 
 
 [27]
 There might be instances in whichR.A.V. would require finding unconstitutional a school policy in a case governed by Tinker. Presumably, a school cannot distinguish between subclasses of disruptive speech on any basis it chooses. Where such a distinction is made on no legitimate basis at all, it might be possible to conclude the subcategory of disruptive speech had been singled out simply because the school officials disfavored the views expressed. Cf. Saxe, 240 F.3d at 206-10 (discussing R.A.V. in school disciplinary context, but not holding policy unconstitutional on that basis).
 
 
 
 118
 ROSENN, Circuit Judge, concurring and dissenting.
 
 
 119
 I concur and join in Parts I, II, and subsections (2) and (3) of Part III of the well-drafted majority opinion. However, I do not agree that any part of the Warren Hills School Board's (WHSB or Board) policy to combat racial harassment in its elementary and public schools was impermissible or unconstitutional. I therefore respectfully dissent from the majority's decision that the District Court abused its discretion in denying a preliminary injunction, particularly on a record comprised of affidavits and not testimony, that sought to enjoin enforcement of the School Board's anti-racial harassment policy.
 
 I.
 
 120
 WHSB adopted its anti-racial harassment policy "in response to a pattern of disturbing racial incidents." (Maj. op. at 246) The first racial incident occurred in October 1999 at the high school when a white student dressed for Halloween appeared at the school wearing overall jeans, a straw hat, and a thick rope around his neck. The student had tied the rope in a noose and blackened his face. The majority describes the growing pattern of incidents at the high school during the year 2000-2001, the many students "deeply offended" by the racial incidents, and the new student recently enrolled at the high school who was physically threatened at his home by a large group of teenagers. I, therefore, will not repeat them. "The District Court also found the racial tension spilled over into the classroom, displacing class lessons with discussions about racial relations." (Maj. op. at 247)
 
 
 121
 The Warren Hills High School (WHHS) consists of approximately 1200 students from grades seven to twelve. Fewer than sixty of those are African-American. An indication of the depth to which racial harassment had descended at the high school by the time the WHHS adopted its anti-harassment policy is a series of actions by students and the School District to achieve relief. In May 2000, Hester German, a high school sophomore, filed a complaint with the Warren County Human Relations Commission alleging racial harassment. Her complaint noted concerns about students wearing T-shirts with the Confederate flag, some of which also had the word "Redneck." As a result, the School District initiated a program to promote the value of diversity and assured the Human Relations Commission that it would monitor the situation carefully. By the beginning of the school year, 2000-2001, the severity of racial relations had escalated. Students not only wore Confederate flags on their T-shirts but gang-like behavior commenced with racially-fired hate groups known as "Hicks" appearing at the high school.
 
 
 122
 In October 2000, the Warren County Human Relations Commission submitted a letter to the School Board in support of the Board's efforts to deal with racial bias on an individual basis. On October 20, 2000, as the majority observes, the School District's Mediation Coordinator, Timothy Downs, issued an internal report concerning the racial strife at the high school during the preceding month. The report stated: "At this time, this issue is too complex, involves too many people, and is too controversial for Peer Mediation Services." (Maj. op. at 6) With racial harassment escalating, a fight occurred between a black student and a white student that resulted in a concussion and stitches for one of the students. (Maj. op. at 5)
 
 
 123
 Racial harassment at the high school continued unabated between October 2000 and February 2001. The Board increasingly became concerned for the safety of the minority population at the high school. Having exhausted its resources at independent intervention, the Board and its school superintendent, Merluzzi, concluded that the "minority population was at significant risk from, not only verbal and intimidating harassment, but also ... physical violence." The Board thereupon researched anti-harassment policies around the country and ultimately selected a policy that it concluded best fit the situation at hand — a policy that had been upheld by the Court of Appeals for the Tenth Circuit. Shockingly, within days after the adoption of the policy, sexually and racially obscene graffiti were found in the boys' and girls' restrooms, too vulgar to repeat.
 
 
 124
 The anti-racial harassment policy adopted on March 13, 2001, by the School Board provides in pertinent part:
 
 Racial Harassment or Intimidation
 
 125
 District employees and student(s) shall not racially harass or intimidate other student(s) or employee(s) by name calling, using racial or derogatory slurs, wearing or possession of items depicting or implying racial hatred or prejudice. District employees and students shall not at school, on school property or at school activities wear or have in their possession any written material, either printed or in their own handwriting, that is racially divisive or creates ill will or hatred. (Examples: clothing, articles, material, publications or any item that denotes Ku Klux Klan, Arayan Nation — White Supremacy, Black Power, Confederate flags, or articles, Neo-Nazi or any other "hate" group. This list is not intended to be all inclusive.)
 
 
 126
 The policy plainly is directed at student misbehavior. It is a code of conduct admonishing students and begins with an opening statement not to "racially harass or intimidate other student(s) or employee(s) by name calling, using racial or derogatory slurs, wearing or possession of items depicting or implying racial hatred or prejudice." The balance of the operative paragraph amplifies the opening statement directing employees and students while at school not to wear or possess "any written material... that is racially divisive or creates ill will or hatred." This statement is followed by examples such as items denoting the Ku Klux Klan, White Supremacy, Black Power, Confederate flags, neo-Nazi or any other hate groups. It is essentially a policy obviously designed to curb student racial misbehavior, prejudice and hatred and to encourage civility and respect for the rights of other students. Nothing in it prohibits or discourages protected freedom of expression. The policy complements the mission of the school to prepare pupils for citizenship, and to promote human values and a peaceful society. It is not a speech code "disfavored for[its] tendency to interfere with or silence protected speech." (Maj. op. at 268)
 
 II.
 
 127
 The plaintiffs, one in the Middle School and the other in high school, assert a First Amendment right to wear a T-shirt with the word "Redneck" printed on it. Relying on Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) and our recent decision in Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200 (3d Cir. 2001), they argue that wearing the T-shirt is protected speech and that applying the policy to ban wearing it violates their First Amendment rights. In Tinker, the court declared that neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the school-house gate." Id. at 506, 89 S.Ct. 733. However, the right of freedom of expression is not absolute. The Court recognized the right of a student to express opinions with the proviso that "he does so without `materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school,' and without colliding with the rights of others." 393 U.S. at 503, 89 S.Ct. 733 (quoting Burnside v. Byars, 363 F.2d 744, 749 (5th Cir.1966)).
 
 
 128
 In his concurrence, Mr. Justice White deemed it appropriate to note that "the Court continues to recognize a distinction between communicating by words and communicating by acts or conduct which sufficiently impinges on some valid state interest." Id. at 515, 89 S.Ct. 733. In the instant case, the plaintiffs raise First Amendment rights to communication by conduct, not oral speech. In his concurrence, Mr. Justice Stewart stated that he could not share the majority's assumption "that, school discipline aside, the First Amendment rights of children are coextensive with those of adults." Id. at 515, 89 S.Ct. 733.
 
 
 129
 The facts in Tinker differ from what we have here. In Tinker, the students wore black armbands to express a political point of view — publicizing their objections "to the hostilities in Vietnam and their support for a truce." Id. at 504, 89 S.Ct. 733. In the instant case, it is difficult to find much expression in the T-shirt, although the plaintiffs claim that the expression is one "about being a `Redneck sports fan,'" not much of an expression of an idea. However, the school authorities saw in it an inflammatory identification with the Hicks and racial harassment.
 
 
 130
 In Tinker, the Supreme Court noted that the wearing of the armbands "in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it. It was closely akin to `pure speech.'" Id. at 505, 89 S.Ct. 733. The Court distinguished between a situation involving "pure speech" and one involving aggressive, disruptive action or even group demonstrations. There was no evidence whatever in Tinker of any interference "with the schools' work or of collision with the rights of other students to be secure and to be let alone." Id. at 508. By contrast, in the instant case, we have evidence of widespread racial harassment of students, disruption of school teaching, violence, interference with the rights of other students, and the subjection of male and female students to sexual and racial obscenities. The effect on many students was offensive, distressing, and profound. As Superintendent Merluzzi and the Board concluded, "there had been significant disruption in the school and ... the population was at significant risk from not only verbal and intimidating harassment but also, increasingly, the risk of physical violence."
 
 
 131
 The plaintiffs argue that a restriction on free expression does not "pass constitutional muster" unless the school can "point to a well-founded expectation of disruption — especially one based on past incidents arising out of similar speech." Cf. Saxe, 240 F.3d at 211. They assert that because there have never been any racial incidents relating to the T-shirt or the word "redneck," the decision to ban T-shirts is not based on a "specific and significant fear of disruption." This argument lacks merit. First, as Judge Scirica observed at oral argument, plaintiffs' position represents an "almost impossible standard to satisfy." Second, the School Board can point to evidence of disruption, or to a well-founded expectation of disruption or interference with the rights of other students. In Tinker, the court not only spoke of the school's fear of disruption but added another important dimension. The Court also expressed concern over whether the challenged conduct "would substantially interfere with the work of the school or impinge upon the rights of other students." 393 U.S. at 509, 89 S.Ct. 733. These are conditions and concerns that also weighted heavily on the WHSB.
 
 
 132
 Under such circumstances as confronted the WHSB, the Supreme Court has held that officials are not entirely helpless. Even under less disruptive and racially harassing circumstances than the WHSB confronted, the Court has recognized the highly appropriate function of public school education "to prohibit the use of vulgar and offensive terms in public discourse." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). The Court upheld in that case a disciplinary rule proscribing "obscene" language and sanctions for a lewd speech by a high school student. Here, we have obscenities and much more. The Court in Fraser emphasized the importance of public education to prepare pupils for citizenship and the "fundamental values of habits and manners of civility essential to a democratic society [that tolerates] divergent political and religious views, [but which] also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students." Id. at 681, 106 S.Ct. 3159.
 
 
 133
 The Fraser Court also echoes New Jersey v. T.L.O., 469 U.S. 325, 340-342, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), holding that "the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings." Id. at 682, 106 S.Ct. 3159. It does not follow that because an offensive form of expression may not be prohibited for adults under certain circumstances that "the same latitude must be permitted to children in a public school." Fraser, 478 U.S. at 682, 106 S.Ct. 3159.
 
 
 134
 In Hazelwood Sch. Dist. v. Kuhlmeier, the Supreme Court concluded that the standard articulated in Tinker for determining when a school may punish student expression need not also be the standard governing a school's refusal to lend its name and resources to the dissemination of school expression. Instead, the Court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (footnote omitted). The Court also observed, of pertinence here, that the education of the Nation's youth is primarily the task "of parents, teachers, and state and local school officials, and not of federal judges." Id. The Court made the point that only when the decision to censor a vehicle of student expression has no valid educational purpose is the First Amendment so directly and sharply implicated as to require judicial intervention to protect students' constitutional rights. Here, the T-shirt had no valid educational purpose and the School Board's policy had a legitimate pedagogical concern.
 
 
 135
 The plaintiffs contend, however, and the majority apparently agrees, that their "Redneck Sports Fan" T-shirt did not "materially and substantially interfere" with the school's work or the rights of other students. Confronted with an acute, critical problem of racial harassment, intimidation, and violence as was the WHHS, the decision whether the wearing of the shirt "materially and substantially interfered" with the school's work and the rights of other students was best determined by the school authorities. The school authorities were on the firing line; they were in a position to feel the heat of the fray, perceive the tensions and intimidation, and see the effect on school classes. Federal judges, especially in this case where no witnesses have testified, have only a cold, lifeless record.
 
 
 136
 Yet, even on this record, there is substantial evidence in the affidavits from which to determine that the "Redneck" T-shirt materially and substantially interfered with the school's work and the rights of other students. The racial harassment at the school commenced with T-shirts. Offensive Confederate flags were indisputably emblazoned on the shirts. Before the adoption of the policy, Tom Sypniewski, the older of the three brothers and initially a plaintiff, had been observed in the high school with the Confederate flag displayed on the back of his shirt. Immediately after the policy was instituted, he wore the "Redneck" T-shirt to school. The school newspaper reported that he wore the shirt "because it is associated with the words `redneck' and `hick,'" a term by which he and his friends refer to themselves.
 
 
 137
 Tom previously had been photographed in the Newark Star Ledger wearing a shirt that stated "not only am I perfect, but I'm a redneck too," with a Confederate flag illustrated on the word "redneck." He also had been observed pre-policy wearing a shirt with the Confederate flag displayed. There had been a two-year pattern of disruption and interference with classes and students before the adoption of the harassment policy, focused in the early stages on the use of the Confederate flag by a group known as the "Hicks."[28] Many students believed that the Hicks were also known as the Rednecks.[29] The perception of the school newspaper when Tom was photographed wearing the T-shirt immediately after the adoption of the anti-harassment policy that the Rednecks and the Hicks were associated together was also a perception of the school authorities.
 
 
 138
 Plaintiffs also assert that "redneck" is not pejorative and, therefore, the policy should not have been applied to it; they claim it is an innocuous synonym for "hick." This argument is unavailing. Although they acknowledge that the District Court used Webster's Third New International Dictionary to determine that "redneck" is defined as a "white member of the Southern rural laboring class," they ignore the most salient portion of the District Court's definition: that the term "redneck" is "usually used disparagingly." "Redneck" and "hick," though similar terms, had become identified at the high school with some form of racial and divisive animus. The District Court recognized that the words "while certainly not identical, are quite similar, particularly given the overall school context." (Dist. Ct. op. at A-68) The District Court further found similarities "between the Confederate flag and the term `redneck' as well indicated, for instance, by German's complaint about a shirt with both the words `redneck' and a Confederate flag."
 
 
 139
 Superintendent Merluzzi and Assistant Principal Griffith, in determining how the "redneck" T-shirt was or would be perceived by the student body on the heels of the disruptive effect of the Confederate flag on student T-shirts, had a "well founded expectation of disruption" and interference with the rights of the other students. The "defendants here have presented substantial evidence of disruption that constitutes a solid foundation for fear of future disruption." (Maj. op. at 262-63) In addition, there is substantial evidence that wearing T-shirts, whether depicting the Confederate flag or "redneck," were symbols of racial intolerance and divisiveness to the students and faculty that substantially interfered with school operations and invaded the rights of other students. Tinker spoke not only in terms of disruption of school activities but in the disjunctive, interference with the rights of others.
 
 
 140
 Finally, the appellants assert that the policy has been discriminatorily applied because Tom was disciplined for wearing the T-shirt and Brian was not. This argument also fails. First, the Board has recognized that "in hindsight action should have been taken" against Brian, too. Moreover, although the policy is district-wide, there is no reason that the policy must have the same breadth in the middle school that it has in the high school. The high school has been the major racial battleground; indeed, neither party has made this Court aware of any racial incidents occurring in the middle school. What is likely to have a disruptive effect in one environment is not necessarily likely to have the same effect in another. The School Board reasonably concluded that due to the two-year cycle of racial harassment the T-shirt posed a threat of disruption and interference with the rights of other students in the high school that was not present in the middle school. The School Board did not apply the antiracial harassment policy unconstitutionally.
 
 III.
 
 141
 The plaintiffs also assert that the policy is facially unconstitutional in its entirety. I agree with the majority that striking down a statute or a school regulation because it is overbroad on its face is "strong medicine." As the Court stated in New York v. Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), facial unconstitutionality is employed "with hesitation, and then only as a last resort." This is particularly true in an elementary and high school environment where "the overbreadth doctrine warrants a more hesitant application ... than in other contexts." (Maj. op. at 258-59) The reasons are obvious and well stated by the majority. It notes that here, "the history of racial hostility demonstrates the policy was intended to address a particular and concrete set of problems involving genuine disruption." (Maj. op. at 261-62) Nonetheless, the majority holds that the anti-racial policy "directed at material that `creates ill will' is unconstitutional." (Maj. op. at 265)
 
 
 142
 The policy is entitled "Racial Harassment or Intimidation," and the introductory sentence focuses on conduct depicting hatred or prejudice. As to the second sentence in which the phrase "creates ill will" appears, it is conjoined with school activities and materials that are "racially divisive or create[] ill will or hatred." Thus, the ill will phrase is limited to students and employees of the WHSD "at school, on school property or at school activities." As to the students at this school, it appears plain that they are not to wear or possess items at school that will create ill will, and thus aggravate the racial harassment at the school.
 
 
 143
 The Court of Appeals for the Tenth Circuit, in construing these precise words in a similar school policy challenged by a student as overbroad, held that the policy "does not threaten protected speech and is not unconstitutionally overbroad." West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1368 (10th Cir.2000). The Merriam Webster Collegiate Dictionary, 9th ed. (1990) defines "ill will" and "malice" as synonymous. The term "malice" has been in use in legal jurisprudence for centuries and is well defined in both criminal and civil law. Black's Law Dictionary, 7th ed. (1999) also defines it in a nonlegal context as "ill will; wickedness of heart." This court defined the term "malice" in Lippay v. Christos, 996 F.2d 1490 (3d Cir.1993) which involved a malicious prosecution claim, as "ill will in the sense of spite ... or its use for an extraneous improper purpose." Id. at 1502. The term "malice" appears frequently in the case law, and like "ill will," has a well developed legal meaning. Malice generally means that harm is inflicted intentionally and without justification or excuse. See, e.g., Ideal Dairy Farms v. John Labatt, Ltd., 90 F.3d 737, 747 (3d Cir.1996). Therefore, as used in the anti-racial policy here, conduct that creates ill will or malice has a well defined meaning. It is not overbroad, especially in a high school setting where the school authorities are not drafting a statute but only a policy for students.
 
 
 144
 Running through each of these definitions is an element of enmity, spite, or improper purpose — "wickedness at heart." Moreover, in this case we deal not with pure speech but student conduct. I therefore disagree with the majority's statement that "[a]s a general matter, protecting expression that gives rise to ill will — and nothing more — is at the core of the First Amendment." (Maj. op. at 264-65) There is more here, much more, in light of the decisions referred to above and the definition of ill will. Conduct in a public school differs from pure speech in a public forum or a legislative body, especially at a time when a school is suffering from high tension, disruption, and interference with the rights of other children. At the core of a definition of "ill will" is "something more than mere offense" described by the majority. Here, we have "ill will" in the form of misconduct in a school ambience indisputably disrupted with racial divisiveness. Under such circumstances, "a serious possibility ... might be inferred" of inciting more disruption or prolonging the disruption already present.
 
 
 145
 For these reasons, the majority's conclusion that the words ill will "expands the policy too far into the domain of protected expression" is not well founded. Even though in an adult public forum or in the public press, speech spoken with malice is unprotected, see New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the majority gives words of enmity and wickedness at heart in a children's ambience an unjustifiable sense of propriety. It does this at a time when the Nation's public schools are struggling for survival. Such protective construction of words, I fear, to children attending elementary and public schools may only encourage them to defy their teachers, discourage school teachers, and threaten to undermine a school system already under strong attack.
 
 
 146
 The schools of this Nation undoubtedly have contributed to giving us tranquility and to making us a more law-abiding people. Uncontrolled and uncontrollable liberty is an enemy to domestic peace.
 
 
 147
 We cannot close our eyes to the fact that some of the country's greatest problems are crimes committed by the youth, too many of school age. School discipline, like parental discipline, is an integral and important part of training our children to be good citizens — to be better citizens.
 
 
 148
 Tinker, 393 U.S. at 524, 89 S.Ct. 733 (Black, J., dissenting).
 
 IV.
 
 149
 In conclusion, it must be noted that pending before us is the denial by the District Court of a request for a preliminary injunction. The court's decision was based on a record consisting of affidavits only, without any witness having been subjected to cross-examination. The District Court emphasized the preliminary nature of the proceedings and of its order. The denial of a preliminary injunction is committed to the sound discretion of the district judge. The scope of appellate review is narrow. Unless the trial court abused its discretion, or committed an obvious error in applying the law, we must take the judgment of the trial court as presumptively correct. Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir.1992); Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir.1982) (en banc).
 
 
 150
 Under these circumstances, we should be quite deferential to the District Court's order and affirm. Indeed, "the most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." 11A Wright & Miller, Federal Practice and Procedure § 2947 (1995). There should be no concern here that the judicial process will be rendered futile through the District Court's denying injunctive relief. The case will proceed to trial and the children in the meantime should behave by conforming to the school's policy until the District Court will have acted on the application for a permanent injunction.
 
 
 151
 Moreover, "[a]s a prerequisite to the issuance of an interlocutory injunction.... [t]here must be no disputed issues of fact." Charles Simkin & Sons, Inc. v. Massiah, 289 F.2d 26, 29 (3d Cir.1961). Here, there are many disputed facts, militating against injunctive relief. Finally, an injunction should issue "only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief." Opticians Ass'n of America v. Indep. Opticians of America, 920 F.2d 187, 192 (3d Cir.1990). The plaintiffs simply have not met that burden, as the District Court found that several factors militate against injunctive relief. Because I do not believe the District Court erred in denying injunctive relief and that the school policy is unconstitutional as applied or facially overbroad, I respectfully dissent.
 
 
 
 Notes:
 
 
 [28]
 The plaintiffs argue that the school newspaper was wrong and that Tom was not a member of the Hicks. Whether Tom was or was not a member of the Hicks is irrelevant. Relevancy lies in how the students and the paper perceived Tom, and they were under the impression that Tom wore the shirt because of his association with the Hicks
 
 
 [29]
 Superintendent Merluzzi averred,inter alia, "that [m]any of the students at the high school who are familiar with the group that calls themselves the `hicks' are also of the opinion that this ... racially intolerant group also called themselves the `rednecks.'"