**Walter A. BAIR and Ellen Wray, Plaintiffs,**

v.

**SHIPPENSBURG UNIVERSITY and Anthony F. Ceddia in his individual and official capacities, Defendants.**

No. 4:03–CV–671.

United States District Court, M.D. Pennsylvania.

Sept. 4, 2003.

William A. Bonner, William Adair Bonner, Attorney at Law, Media, PA, David A. French, Greenbaum Doll & McDonald, PLLC, Lexington, KY, for Plaintiff.

Jeffrey Cooper, Pennsylvania State System of Higher Education, Office of Chief Counsel, Harrisburg, PA, for Defendant.

## ORDER

JONES, District Judge.

This case presents us with the difficult question of whether portions of an obviously well-intentioned student code of conduct enacted by a state university can withstand First Amendment scrutiny.

Based upon our past experiences in public office, this Court has an acute awareness of the challenges facing the administrators of our colleges and universities. Campus underage and binge drinking have

reached epidemic proportions. Student against student violence, including sexual assaults, is a constant concern. Parents and administrators know well that when college students reach the age of majority, this milestone does not instil instant maturity. Indeed, many students continue to demonstrate a reckless disregard not only for their own safety, but fail to respect the rights of their peers.

█ The Court is also aware, however, that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what will be orthodox in politics, nationalism, religion, or matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Against this backdrop, we must determine whether Anthony P. Ceddia, as the President of Shippensburg University, should be enjoined from enforcing provisions of a student code which unquestionably was enacted with the noble purpose of making that institution a better place to live and learn.

Pending before the Court is a motion to dismiss filed by the defendant, as well as a motion for a preliminary injunction filed by the plaintiffs. For the reasons that follow, the Motion to Dismiss will be granted in part and denied in part, and the Motion for a Preliminary Injunction will be granted in part.

## I. *BACKGROUND:*

### A. *Procedural History*

The plaintiffs, Walter A. Bair ("Bair") and Ellen Wray ("Wray") (collectively, "Plaintiffs"),[1] initiated this action by filing a complaint against the defendants, Shippensburg University ("the University" or "Shippensburg University") and Anthony F. Ceddia[2] ("President Ceddia" or "Defendant")(collectively, "Defendants"), on April 22, 2003. Plaintiffs challenge the constitutionality of the University's speech policies based upon their contention that the policies violate students' First Amendment rights to free speech, free association and free exercise of religion.

On June 23, 2003, Defendants filed a motion to dismiss Plaintiffs' Amended Complaint. Thereafter, on July 23, 2003, Plaintiffs filed a motion for a preliminary injunction, seeking an order from this Court which would prohibit Defendants "from enforcing the speech-restrictive policies contained within the University's Code of Conduct and within its Racism and Cultural Diversity Policy Statement." (Pls.' Mot. Prelim. Inj. at 1).

Oral argument regarding the pending motions was held on August 25, 2003. Subsequent to the completion of day's proceedings, we issued an order dismissing Shippensburg University as a defendant in this action. (*See* Order dated August 25, 2003).

### B. *The University Speech Code*

Plaintiffs frame their arguments as to the constitutionality of the University's

---

1. The caption of the Complaint originally named John Doe and Jane Doe as plaintiffs. On June 18, 2003, Plaintiffs submitted an amended complaint replacing the name Jane Doe with that of Ellen Wray. On July 31, 2003, and consistent with our order dated July 21, 2003, within which we denied Plaintiff's Motion for a Protective Order, Plaintiffs

filed a Motion to Substitute Party by John Doe. That motion was granted on August 5, 2003, and the name Walter A. Bair was substituted for John Doe.

2. Ceddia is the President of Shippensburg University.

speech policies by initially characterizing two University publications, the University Catalog and the University Student Handbook, as either the University Speech Code or as the Swataney when considered together in their entirety. (First Amended Complaint at ¶ 7). We shall do the same herein; the totality of the University's policies relevant to our analysis shall be referred to as the University Speech Code, the Code, or as the Swataney.

The objectionable portions of the University Speech Code as cited within the parties' submissions are set forth below.[3]

The University Catalog contains a Code of Conduct which provides the following in its Preamble:

Students, as members of the academic community, are encouraged to engage in a sustained, critical and independent search for knowledge. The University community supports this endeavor by developing policies and procedures that safeguard the freedoms necessary for the pursuit of truth and knowledge. *The University will strive to protect these freedoms if they are not inflammatory or harmful toward others.* It is therefore expected that students will exercise these freedoms in a manner that does not infringe upon the rights of others in the community. Behavior that interferes with the living conditions, co-curricular activities, working environments, teaching mission, research activities, study conditions, and/or administrative functions of the University is unacceptable. *Acts of intolerance directed toward other community members will not be condoned. This is especially true, but not limited to, acts of intolerance directed at others for ethnic, racial, gender, sexual orien-*

*tation, physical, lifestyle, religious, age, and/or political characteristics.*

(Defs.' Br. Supp. Mot. Dis. Ex. 1 pg. 18)(emphasis added).

The Community Regulations section of the Code of Conduct distinguishes "primary rights" and "secondary rights" within the University setting:

Students have certain rights related to their achievement of academic success and personal satisfaction. With these rights comes a reciprocal responsibility to insure that others have similar rights. Therefore, the University strives to strike a balance between maximum freedom and necessary order. Primary rights, especially for University owned campus housing residents, include:

A. The right to pursue academic activities without unreasonable disruption.

B. The right to be free from harassment, intimidation, physical harm, and emotional abuse.

C. The right to a reasonable level of quiet, and correspondingly, the right to sleep and study without unreasonable disruption.

D. The right to a reasonably clean, well maintained, and safe environment.

Secondary rights, especially for University housing residents are those that, while protected, shall not infringe upon the reasonable exercise of others' primary rights. These include:

A. The right to host visitors. Visitors shall not interfere with a roommate's exercise of his/her rights, nor violate the rights of other residents. Visitors must follow all rules and regulations.

---

3. Emphasis has been utilized by the Court in order to delineate which portions of the University Code Plaintiffs' seek to enjoin the enforcement of.

B. The right to express a personal belief system. *The expression of one's beliefs should be communicated in a manner that does not provoke, harass, intimidate, or harm another.*

C. The right to follow the terms of one's lifestyle provided it does not unreasonably interfere with the rights of others.

D. The right to a reasonable level of personal privacy.

(Defs.' Br. Supp. Mot. Dis. Ex. 1 pg. 22)(emphasis added). Also objected to within the Community Regulations portion of the Code of Conduct is a provision instructing readers that *"[n]o person shall participate in acts of intolerance that demonstrate malicious intentions toward others."* (Defs.' Br. Supp. Mot. Dis. Ex. 1 pg. 23)(emphasis added).

The University has propounded the Racism and Cultural Diversity Statement which provides as follows:

As an institution of higher learning, Shippensburg University is committed without qualification to all aspects—moral, legal and administrative—of racial and cultural diversity. *It is the unequivocal position of Shippensburg University to prohibit racism/ethnic intimidation and harassment; and to affirm cultural diversity, social justice and equality.*

*Racism shall be defined as the subordination of any person or group based upon race, color, creed or national origin. It shall be a violation of this policy for any person or group to maliciously intend to engage in any activity, (covert or overt that attempts to injure, harm, malign or harass), that causes the subordination, intimidation and/or harassment of a person or group based upon race, color, creed, national origin, sex, disability or age.*

*Shippensburg University's commitment to racial tolerance, cultural diversity and social justice will require every member of this community to ensure that the principles of these ideals be mirrored in their attitudes and behaviors.*

(Defs.' Br. Supp. Mot. Dis. Ex. 2)(emphasis added).

University policy provides that undergraduate students shall pay a student activity fee "to fund the numerous extracurricular student activities on campus, including men's and women's intercollegiate athletics, intramural athletics, sport clubs, classes and councils, performing art groups, publications groups (newspaper [Slate], campus radio station [WSYC]), [ ] the Activities Program Board[,]" and other recognized student organizations and clubs. (First Amended Complaint at ¶ 18). According to the First Amended Complaint, the provisions of the Code of Conduct as well the University Racism and Cultural Diversity Policy apply to student organizations as well as to individuals within the Shippensburg campus community:

No group, or its members, shall violate any of the rules and regulations published by the University, including those comprising the student code of conduct.

(See First Amended Complaint at ¶ 15).

Finally, Plaintiffs object to certain restrictions set forth by the University in the form of a letter ("the Letter"), dated March 25, 2003, from President Ceddia to Members of the Campus Community wherein he advises recipients that the University has "reserved certain spaces on campus" for organized demonstrations and rallies, limited to "the area by the gazebo between the Library and Franklin Science Center and the triangular lawn defined by the sidewalks leading to the Cumberland

Union Building facing Franklin Science Center." (Complaint Ex. C). The Letter further informs its recipients that in the event of inclement weather, "demonstrators must reserve rooms through normal University procedures [and a] sign stating the purpose for which the room is being used must be clearly posted outside the door." (Complaint Ex. C).

## II. *MOTION TO DISMISS:*

### A. *Standard of Review*

In considering a motion to dismiss, a court must accept the veracity of a plaintiff's allegations. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see also White v. Napoleon,* 897 F.2d 103, 106 (3d Cir.1990). In *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir. 1996), our Court of Appeals for the Third Circuit added that in considering a motion to dismiss based on a failure to state a claim argument, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims." Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also District Council 47 v. Bradley,* 795 F.2d 310 (3d Cir.1986).

The court will now discuss Defendant's motion in light of the standards set forth above and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### B. *Standing*

Defendant argues that Plaintiffs lack standing to bring this suit. In this regard, President Ceddia asserts that "Plaintiffs' allegations are too speculative and do not establish that their subjective fears are objectively reasonable." (Defs.' Br. Supp. Mot. Dis. at 24).

■ Article III of the Constitution provides that only litigants presenting an actual controversy have standing to maintain suit in federal court. In other words, in order to be a proper party in this Court, one must have a personal stake in the outcome of a dispute. *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663(1962)("the gist of the question of standing" must be resolved in a manner so as "to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions"). "To establish [the requisite] interest, a litigant must show that he or she has personally suffered some actual or threatened injury from the putatively illegal conduct of the defendant, that the injury could fairly be traced to the illegal conduct, and that it would be redressed by a favorable decision." *Doe v. University of Michigan,* 721 F.Supp. 852, 859 (1989).

■ There is, however, an exception to the general standing rules. "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County,* 505 U.S. at 129, 112 S.Ct. 2395(*citing City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798–99, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987)); *see also Indo–American Cultural Society, Inc. v. Township of Edison, New Jersey, et al.,* 930 F.Supp. 1062 (1996). This exception to the customary standing requirements has been justified "based upon an appreciation

that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the Court." *Id.* (*citing New York v. Ferber,* 458 U.S. 747, 772, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)).

Plaintiff Walter Bair is entering his senior year at Shippensburg University and is therefore subject to the provisions of the University Speech Code. According to the allegations set forth in the First Amended Complaint, Bair "fears that the discussion of his social, cultural, political and/or religious views ... may be sanctionable under applicable University [S]peech [C]ode[ ]." (First Amended Complaint at ¶ 24). Plaintiff Ellen Wray is a recent graduate of Shippensburg University and maintains that while in attendance there "she was reluctant to advance certain controversial theories or ideas regarding any number of political or social issues because ... she feared that discussion of such theories might be sanctionable under applicable University [S]peech [C]ode[ ]." (First Amended Complaint at ¶ 26). Plaintiffs both allege that they were members of student organizations which hold opinions and beliefs that might be sanctionable under the Code. (*See* First Amended Complaint at ¶¶ 25, 27). In sum, Plaintiffs assert that the University Speech Code has "had a chilling effect on [their] rights to freely and openly engage in appropriate discussions of their theories, ideas and political and/or religious beliefs." (First Amended Complaint at ¶ 28).

■ The allegations within the First Amended Complaint constitute harm that is more than merely speculative. Plaintiffs have asserted that both of their past, and Walter Bair's continuing, fears of prosecution pursuant to the Code of Conduct have had a chilling affect on their speech. On

this basis, we find that Plaintiffs have standing to challenge the constitutionality of the University Speech Code. *See Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)("where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish ... [t]here is no want of a proper party to challenge the statute").

**C. University Student Organization Chartering and Funding Guidelines**

In Count IV, Plaintiffs assert that the chartering and funding guidelines "are unconstitutionally vague on their face and constitute and impermissible prior restraint on the Plaintiffs' speech." (First Amended Complaint at ¶ 45). In Count V, Plaintiffs assert that those same guidelines are "overbroad and explicitly and implicitly discriminate on the basis of viewpoint." (First Amended Complaint at ¶ 49). Defendant argues that both of these counts should be dismissed by the Court because the First Amended Complaint "alleges no facts to demonstrate that the [chartering and funding] guidelines are vague, that they are applied in a discriminatory manner, or that political views affect recognition and funding." (Defs.' Br. Supp. Mot. Dis. at 18–19).

Plaintiffs did not respond to Defendant's arguments as to Counts IV and V within their Brief in Opposition to the Motion to Dismiss. However, during the preliminary injunction hearing Plaintiffs clarified the allegations set forth within Counts IV and V. In essence, Plaintiffs contend that University guidelines condition the chartering and funding of student groups on compliance with the University Speech Code, which Plaintiffs maintain is unconstitutional. Plaintiffs argue because the Code is

incorporated by reference into the funding and chartering guidelines, if the Code is found to be unconstitutional, the chartering and funding guidelines must likewise be deemed unconstitutional.

We agree with Plaintiffs that the viability of Counts IV and V is entirely dependant upon the ultimate determination of whether the University Speech Code is constitutional. In light of the procedural posture of the case, Plaintiffs are therefore entitled to present evidence to support their claims.

### D. President Ceddia's March 25, 2003 Letter

Time, place and manner restrictions imposed by the government on protected speech are permissible if they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Northeast Women's Center, Inc. v. McMonagle,* 939 F.2d 57, 62 (3d Cir.1991)(*quoting Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

The restriction at issue, President Ceddia's March 25, 2003 letter, refers to "current and controversial issues" and "global events," and creates restrictions for "organized demonstrations and rallies" involving the aforementioned. (Complaint Ex. C). In so doing, the Letter advises students that the University has reserved particular outdoor spaces for demonstrations and rallies, and that in the event of inclement weather, rooms may be reserved through

"normal University procedures." (Complaint Ex. C).

Defendant contends that the Letter is content neutral, creates public forums for expression of opinion, and does not limit alternative channels of communication. On these grounds, Defendant urges the Court to dismiss Count VII of the First Amended Complaint.

Additionally, Defendant maintains that the "suggestions in ... [the][L]etter are limited in duration and have, obviously, expired ... [since the] likelihood of public demonstration regarding the United States' involvement in Iraq is now remote." (Defs. Rep. Br. Supp. Mot. Dis. Resp. Pls.' Br. Supp. Mot. Prelim. Inj. at 4). On these grounds, Defendant argues that Plaintiffs' claims are now moot "and the effect of the [L]etter, if any, has passed without any allegation of interference with an anticipated demonstration or other damage." (Defs. Rep. Br. Supp. Mot. Dis. Resp. Pls.' Br. Supp. Mot. Prelim. Inj. at 4).

■ Initially, we find Defendant's argument as to mootness to be without merit. Contrary to Defendant's characterizations, the Letter does not indicate that it only applies to demonstrations and rallies relevant to the military action in Iraq.[4] Neither does the Letter indicate that the restrictions encompassed within it are limited in duration.

■ As to the reasonableness of the speech restrictions within the Letter, we agree with Plaintiffs that an issue of fact exists as to whether the scheme set forth within the Letter leaves open ample alter-

---

**4.** Indeed, had the Letter included language referencing demonstrations regarding the military action in Iraq in particular, the regulation would conceivably fail to pass muster with regard to the requirement of content neutrality. *See Ward,* 491 U.S. at 792, 109

S.Ct. 2746(the content-neutrality analysis involves a determination of "whether the government has adopted a regulation of speech because of disagreement with the message it conveys").

native means of communication. Because there is no evidence on the record regarding the size or accessibility of the area available for demonstrations, there is not a sufficient basis from which we may determine whether or not the alternative channels of communication are adequate. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)("a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate"). Accordingly, we hold that inasmuch as Plaintiffs challenge the constitutionality of the time, place and manner restrictions propounded in the Letter, they have stated a viable claim in Count VII of the First Amended Complaint.

### III. *MOTION FOR A PRELIMINARY INJUNCTION:* [5]

Preliminarily, it is easy to discern that the provisions of the student code in question were part of an attempt to achieve a utopian community within Shippensburg. Students are directed to respect the rights of other students in a world where reasoned, rational debate is the norm. Defendant argues that the prohibitions set forth within the Code will foster free speech, rather than discourage it. Regrettably, this sword has two edges. Certainly during President Ceddia's tenure the Speech Code has not been used, and likely will not ever be used, to punish students for exercising their First Amendment rights. However, given that this is a facial chal-

lenge, our inquiry must assume not the best of intentions, but the worst.

The determination that an injunction should issue is conditioned upon a finding that the movant has established the following: "(1) a likelihood of success on the merits; (2) irreparable harm without the injunction; (3) a balance of harms in the movant's favor; and (4) the injunction is in the public interest." *American Civil Liberties Union v. Ashcroft,* 322 F.3d 240, 247 (3d Cir.2003)(*citing Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir.1999)).

■■■ In this case, Plaintiffs have asserted that the University Speech Code is unconstitutional because it is facially overbroad and vague. The concept of overbreadth refers to the legal doctrine that permits courts to strike down statutes that are so broadly written that they create a chilling effect on legitimate constitutionally protected speech. *See* BLACK'S LAW DICTIONARY 1129 (7th ed.1999). The doctrine of vagueness, on the other hand, refers to the ability of courts to strike down statutes that fail to "provide fair warning" of prohibited conduct. *Id.* at 1548.

### A. Overbreadth

■■■ The facial challenge to Shippensburg University's Speech Code on overbreadth grounds will only succeed upon a finding that there is "a likelihood that the [the Code's] very existence will inhibit free expression by inhibiting the speech of third parties who are not before the Court." *Saxe,* 240 F.3d at 214(*quoting Taxpayers for Vincent,* 466 U.S. at 799,

**5.** Plaintiffs' Motion for a Preliminary Injunction and Defendant's Motion to Dismiss are inextricably intertwined. If Plaintiffs are able to establish substantial likelihood of success on the merits, Defendant's Motion to Dismiss must be denied inasmuch as it seeks to dismiss Counts I through VI of the First Amended Complaint. For this reason, the scope of our analysis shall be limited in that upon a finding that Plaintiffs have evidenced a likelihood of success on the merits, Defendant's argument that Counts I through VI should be dismissed because Plaintiffs have failed to set forth facts sufficient to support their claim that the Code is facially overbroad and vague will be rejected.

104 S.Ct. 2118). We must, in our analysis, remain cognizant of the fact that the overbreadth doctrine is narrowly applied. *See Sypniewski v. Warren Hills Regional Board of Education*, 307 F.3d 243, 259 (3d Cir.2002)(*citing Los Angeles Police Dept. v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999)). To render a law unconstitutional, the "overbreadth must be 'not only real but substantial in relation to the statute's plainly legitimate sweep.'" *Id.* (*quoting Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)); *see also Sypniewski*, 307 F.3d at 259.

Our analysis as to overbreadth is governed by the Third Circuit's holding in *Saxe*, where the Court considered and ultimately struck down a school district's antiharassment policy. At the outset, we acknowledge that *Saxe* is not directly on point with the case at bar: the Code before us was promulgated by administrators of a public university rather than by administrators employed by a public secondary school.

With regard to the unique quality of the public secondary and elementary school settings, Supreme Court precedent demonstrates that "[b]ecause of the duties and responsibilities of the public elementary and secondary schools, the overbreadth doctrine warrants a more hesitant application in this setting than in other settings." *Sypniewski*, 307 F.3d at 259("In the public school setting, the First Amendment protects the nondisruptive expression of ideas. It does not erect a shield that handicaps the proper functioning of the public schools."). As noted by Judge Alito in *Saxe*, the Supreme Court held in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), that because students do not "shed their constitutional rights to freedom of speech or expression at the school house gate," *Id.*, 393 U.S. at 506, 89 S.Ct. 733, the regulation of student speech in the public schools "is generally permissible only [if] the speech would substantially disrupt or interfere with the work of the school or the rights of other students." *Saxe*, 240 F.3d at 211; *see also Grayned v. City of Rockford*, 408 U.S. 104, 119, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)(reiterating that public schools have a "compelling interest in having an undisrupted school session conducive to the students' learning"). Under *Tinker*, only "if a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech"—may the speech regulation pass constitutional muster. *Id.* at 212.

Judge Alito also recognized that since *Tinker*, the Supreme Court has broadened the scope of permissible speech regulation in public secondary and elementary schools. In *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Supreme Court held that a student's "lewd, indecent, or offensive speech" is not protected by the First Amendment in the public school setting and may therefore be regulated by school administrators. *Fraser*, 478 U.S. at 683, 106 S.Ct. 3159("[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board"). Then, in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Supreme Court held that administrators may regulate school-sponsored speech—that speech which "members of the public might reasonably perceive to bear the imprimatur of the school"—so long as the administrators' regulatory "actions are reasonably related to legitimate pedological concerns." *Id.*, 484 U.S. at 271, 273, 108 S.Ct. 562.

The consequence of the Supreme Court's holdings in *Tinker, Fraser,* and *Hazelwood* is that "public secondary and elementary school administrators are granted more leeway [in regulating speech] than public colleges and universities ..." *Sypniewski,* 307 F.3d at 260. Accordingly, a determination that Shippensburg University's Code of Conduct fails to meet the lower threshold for permissive speech regulations applicable in the high school setting would necessitate the corresponding conclusion that the Code does not pass constitutional muster in the university setting. It should be noted, however, that an important guidepost to our analysis is that "[t]he Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe,* 240 F.3d at 215(*citing Tinker,* 393 U.S. at 509, 89 S.Ct. 733; *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *Doe v. University of Michigan,* 721 F.Supp. 852, 863 (E.D.1989)); *see also R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 414, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)("[t]he mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected"); *Sypniewski,* 307 F.3d at 264–65. Thus, regulations that prohibit speech on the basis of listener reaction alone are unconstitutional both in the public high school and university settings.

We now consider the challenged portions of the Shippensburg University Code of Conduct. We do so noting that prior to "declaring the [regulation] unconstitutional, ... we must determine whether it is susceptible to a reasonable limiting instruction: 'the elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Saxe,* 240 F.3d at 215(*quoting Stretton v. Disciplinary Bd. of the Supreme Court of Pennsylvania,* 944 F.2d 137, 144 (3d Cir.1991))(*citing Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494 n. 4, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Broadrick,* 413 U.S. at 617 n. 16, 93 S.Ct. 2908).

First, Plaintiffs object to the following language within the University Catalog Preamble: "[t]he University will strive to protect these freedoms if they are not inflammatory or harmful toward others ... Acts of intolerance directed toward other community members will not be condoned. This is especially true, but not limited to, acts of intolerance directed at others for ethnic, racial, gender, sexual orientation, physical, lifestyle, religious, age, and/or political characteristics." Next, Plaintiffs oppose two sentences within the Community Regulations portion of the Code of Conduct: (1) "[t]he expression of one's beliefs should be communicated in a manner that does not provoke, harass, intimidate, or harm another[;]" and (2) "[n]o person shall participate in acts of intolerance that demonstrate malicious intentions toward others." Finally, Plaintiffs urge the Court to enjoin the enforcement of the entirety of the Racism and Cultural Diversity Statement ("the Statement"), with the exception of the first sentence within it.

Read collectively, the cited portions of the Speech Code would lead a reasonable person to believe that the University sets a number of restrictions on student conduct. To summarize, first, it appears that the University prohibits acts of intolerance that are maliciously motivated, as well as acts of intolerance that are directed at others for a multitude of reasons, a number of which are specifically cited within

the Code. Racism, as defined by the University, is "the subordination of any person or group based upon race, color, creed or national origin." The University forbids students from engaging in means of communication that might "provoke, harass, intimidate, or harm another[,]" and forbids students from "maliciously intending to engage in any activity ... that causes the subordination, intimidation and/or harassment of a person or group based upon race, color, creed, national origin, sex, disability or age." Indeed, the language of the Code instructs students that they must "mirror" the University's ideals as they apply to racial tolerance, cultural diversity and social justice.

■ On its face, it is apparent that the Code of Conduct prohibits speech that is protected by the First Amendment. The amorphous term, "acts of intolerance", within the Preamble of the Code can be reasonably interpreted to encompass speech, not just conduct, that intimates intolerance. So construed, the provision of the Code prohibiting acts of intolerance directed at others, which by its terms provides that it is not limited to the examples of prohibited acts cited therein, could certainly be interpreted as prohibiting speech that is protected by the First Amendment. Likewise, the sentence within the Community Regulations of the Code of Conduct that bans students from taking part in "acts of intolerance" which "demonstrate malicious intent towards others" could be understood to prohibit speech which demonstrates malicious intent. While it is true that First Amendment protections do not extend to some forms of speech, these exclusions do not apply to the foregoing. *See R.A.V.*, 505 U.S. at 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)(*citing Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)(obscenity); *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct.

725, 96 L.Ed. 919 (1952)(defamation); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ("fighting words"); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 124, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)). As such, we conclude that the cited provisions are overbroad.

■ We do, however, find that one of the challenged sentences within the Preamble to the University Catalog does not implicate First Amendment concerns. The Preamble states that "[t]he University will strive to protect [certain enumerated] freedoms if they are not inflammatory or harmful toward others." We agree with Defendant that the cited language seeks to advise the student body of the University's ideals and is therefore aspirational rather than restrictive.

■ With regard to the sentence within the Community Regulations section of the Code which directs students to communicate their beliefs "in a manner that does not provoke, harass, intimidate, or harm anther", we find that this sentence also runs afoul of constitutional concerns. First, the concept of prohibiting communications which "provoke" suggests that a student's beliefs should not be communicated in a way that arouses interest and stimulates a response. Aside from the constitutional concerns of the policy, it is worth noting that such a view is inconsistent with our nation's tradition of safeguarding "free and unfettered interplay of competing views" in the academic arena. *Doe v. Michigan*, 721 F.Supp. 852, 864 (E.D.Mich.1989); *see also Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). Communications which provoke a response, especially in the university setting, have his-

torically been deemed an objective to be sought after rather than a detriment to be avoided. Moreover, the terms "provoke" and "intimidate" focus upon listeners' reactions to speech. As noted previously, however, "the government may not prohibit speech ... based solely on the motive impact that its offensive content may have on a listener ..." *Saxe,* 240 F.3d at 209(*citing Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *United States v. Playboy Entertainment Group,* 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)).

■ Next, in assessing the challenged provisions of the Racism and Cultural Diversity Statement, while we agree with Defendant that the statement within which Shippensburg asserts that it is the University's position "to prohibit racism/ethnic intimidation and harassment[ ] and to affirm cultural diversity, social justice and equality" is merely aspirational, we believe that the remainder of the Statement is overbroad since it appears to prohibit speech that is protected by the First Amendment.

■ To the extent that the Statement defines racism as "the subordination of any person or group based upon race, color, creed or national origin[,]" and to the extent that speech that advocates subordination qualifies as racism under the definition, based upon the prohibition against racism set forth above we find that the Statement is so expansive as to have treaded into the area of protected expression. *See American Booksellers Association, Inc. v. Hudnut,* 771 F.2d 323 (7th Cir.1985)(holding that a city ordinance

which defined pornography as "the graphic sexually explicit subordination of women" is unconstitutional on overbreadth grounds). While such speech will undoubtedly offend, it is nonetheless protected by the First Amendment. "As the Supreme Court has emphatically declared, 'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable.'" *Saxe,* 240 F.3d at 209(*quoting Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)).

■ Next, according to the terms of the Statement, it is a violation of Shippensburg's policies "for any person ... to maliciously intend to engage in any activity ... that causes the subordination, intimidation and/or harassment of a person or group based upon race, color, creed, national origin, sex, disability or age." Again, because the phrase "engage in any activity" necessarily encompasses speech, the entirety of the quoted portion of the Statement fails on overbreadth grounds.

■ That the only speech which appears to be prohibited pursuant to this portion of the Statement is that which is predicated upon either subordination, harassment or intimidation, as well as that which is directed towards persons based upon characteristics that define protected classes, is of no moment to this determination. It is beyond question that Congress has enacted numerous laws which are intended to protect individuals from being discriminated against on the basis of certain immutable characteristics.[6] While the University's objective of preventing forms of discrimination against these protected

**6.** Consider, for example, Title VII, the Americans With Disabilities Act and the Age Dis-

crimination in Employment Act.

classes of individuals is certainly laudable, this ambition still runs afoul of First Amendment concerns if discrimination policies have the effect of prohibiting protected forms of expression. Simply utilizing buzzwords applicable to anti-discrimination legislation does not cure this deficiency. *See e.g. Sypniewski*, 307 F.3d at 264(*citing Saxe*, 240 F.3d at 209)("confining prohibited speech to that which constitutes 'harassment' is not alone sufficient to ensure constitutionality . . . [Indeed], 'harassment,' when targeted on the basis of its expressive content, encompasses speech within the area protected by the First Amendment").

■ Lastly, because Shippensburg's ideals are comprised of precepts which fail to pass constitutional muster, we find that the concluding paragraph of the Statement, which requires "every member of the [Shippensburg University] community to ensure that the principles of [Shippensburg's] ideals be mirrored in their attitudes and behaviors[,]" is also overbroad.

■ Since the University Speech Code, even narrowly construed, prohibits a considerable amount of speech, and since the prohibited speech is neither vulgar nor obscene, we will consider whether the Code's restrictions "are necessary to prevent substantial disruption or interference with the work of the school or the rights of other students." *Saxe*, 240 F.3d at 216.

■ It is clear that "*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe*, 240 F.3d at 211. In this case, Defendant's general justifications for the implementation of the challenged provisions of the Code—that "Shippensburg is seeking to prevent malicious conduct that, in addition to being unlawful, would substantially interfere with the educational process and employment environment, as well as the rights of other persons," are too speculative to satisfy the *Tinker* standard. (Defs.' Br. Supp. Mot. Dis. at 12). Defendant has made no attempt to demonstrate that Shippensburg University suffers from a history of conflict such that an expectation of disruption may be characterized as "well-founded." *Saxe*, 240 F.3d at 212.[7] Moreover, to the extent that the University seeks to prevent criminal behavior, such conduct is already prohibited by criminal laws.

Because we hold that the University Speech Code is likely unconstitutionally overbroad, we need not reach the merits of Plaintiffs' vagueness claim.

■ We turn then to the remaining factors relevant to whether an injunction should issue. Having concluded that the University Speech Code is likely violative of the First Amendment and in acknowledgment of the fact that Plaintiffs have alleged that the Code has had a chilling

---

**7.** This explains the dichotomy between our holding today and the Third Circuit's holding in *Sypniewski*. There, in considering a policy's prohibition on "racially divisive" materials, the Third Circuit concluded that "given the state of racial relations [in the relevant school district, the] defendants appear to have a genuine and well-founded basis for fearing disruption by most . . . of the expression prohibited by the policy." *Sypniewski*, 307 F.3d at 254. In the case at bar, we cannot so easily conclude that broad and undefined conduct like "acts of intolerance", which could be interpreted at including speech that advocates bigoted ideas, is constitutionally permissible when Defendant has failed to establish a genuine fear of disruption or interference with student rights or the educational mission of the University. Significant to the instant matter, the *Sypniewski* Court noted in its decision that the "reliance on the background of turmoil at a particular place and a particular time means that the policy would likely be unconstitutional in another school district, or even in [the defendant school district] at a different time." *Id.* at 265.

effect on their speech, we find that Plaintiffs have established the irreparable harm element of the test. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Tenafly Eruv Ass'n v. Borough of Tenafly,* 309 F.3d 144, 178 (3d Cir.2002). Likewise, we find that the balancing of the hardships weighs in favor of Plaintiffs. Were we to deny a preliminary injunction, the First Amendment rights of Shippensburg University's students would continue to be violated. On the other hand, the issuance of a preliminary injunction leaves Shippensburg free to enact new regulations that are tailored so as to conform to First Amendment jurisprudence. Finally, we find that the public interest favors preliminary injunctive relief. "In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights ..." *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 884 (3d Cir.1997).

## IV. *CONCLUSION:*

Time and again in this case, Defendant has asserted that the challenged provisions of the Code are merely aspirational and precatory, and therefore not subject to First Amendment scrutiny. This argument fails because it is obvious that violations of the express provisions of the Code subject Shippensburg students to the disciplinary process set forth therein. While we recognize that citing students under the suspect provisions has not been a common practice, in the hands of another administration these provisions could certainly be used to truncate debate and free expression by students. Accordingly, we

shall issue a preliminary injunction enjoining Shippensburg University from enforcing the likely unconstitutional provisions of the Code prospectively · during the pendency of this litigation.

We are confident that our holding today will not have a deleterious effect upon the ability of Defendant and his administration to properly regulate student conduct at Shippensburg. Other provisions of the Code, local ordinances, the criminal laws of the Commonwealth of Pennsylvania, and applicable federal anti-discrimination laws all combine to provide adequate safeguards.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1. Defendant's Motion to Dismiss (doc. 16) is denied.[8]

2. Plaintiffs' Motion for a Preliminary Injunction (doc. 19) is granted in part and denied in part. The operation of the following provisions of Code of Conduct shall be enjoined until further order of Court.

 a. "Acts of intolerance directed toward other community members will not be condoned. This is especially true, but not limited to, acts of intolerance directed at others for ethnic, racial, gender, sexual orientation, physical, lifestyle, religious, age, and/or political characteristics." (Defs.' Br. Supp. Mot. Dis. Ex. 1 at 18)

 b. "The expression of ones' beliefs should be communicated in a manner that does not provoke, harass, intimidate, or harm another." (Defs.' Br. Supp. Mot. Dis. Ex. 1 at 22).

 c. "No person shall participate in acts of intolerance that demonstrate ma-

---

**8.** For the sake of clarity and completeness, we note that by order dated August 25, 2003, Defendant's Motion to Dismiss was granted to the extent that Shippensburg University was

dismissed as a defendant in this action. Today, we deny the remainder of the prayers for relief within the Motion to Dismiss.

licious intentions toward others." (Defs.' Br. Supp. Mot. Dis. Ex. 1 at 23).

d. "Racism shall be defined as the subordination of any person or group based upon race, color, creed or national original. It shall be a violation of this policy for any person or group to maliciously intend to engage in any activity, (covert or overt that attempts to injure, harm, malign or harass), that causes the subordination, intimidating and/or harassment of a person or group based upon race, color, creed, national origin, sex, disability or age. Shippensburg University's commitment to racial tolerance, cultural diversity and social justice will require every member of this community to ensure that the principles of these ideals be mirrored in their attitudes and behaviors." (Defs.' Br. Supp. Mot. Dis. Ex. 2).

3. A status call between the parties and the Court will be scheduled by separate order.